**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**MIDLAND-ODESSA DIVISION**

| | | |
|---|---|---|
| Tigo Energy Innovations LLC,<br><br>Plaintiff,<br><br>v.<br><br>SolarEdge Technologies, Inc. and SolarEdge Manufacturing Inc.,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 7:26-cv-00329<br><br>JURY TRIAL DEMANDED |

**COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff Tigo Energy Innovations LLC ("Plaintiff" or "Tigo"), by its attorneys, hereby alleges patent infringement against Defendants SolarEdge Technologies, Inc. ("SolarEdge Technologies") and SolarEdge Manufacturing Inc. ("SolarEdge Manufacturing") (collectively, "Defendants" or "SolarEdge"), as follows:

**INTRODUCTION**

1. This is an action for patent infringement under the United States Patent Laws, 35 U.S.C. § 1 *et seq*.

2. Tigo is the owner by assignment of the following patents: U.S. Patent Nos. 8,274,172 ("'172 Patent"); 8,860,241 ("'241 Patent"); 8,933,321 ("'321 Patent"); 9,813,021 ("'021 Patent"); 10,135,385 ("'385 Patent"); 10,256,770 ("'770 Patent"); 10,686,403 ("'403 Patent"); and 11,228,278 ("'278 Patent") (collectively, the "Tigo Patents"). Copies of the Tigo Patents are attached to this Complaint as Exhibits 1-8.

**BACKGROUND**

3. The Tigo Patents originated with Tigo Energy, Inc. ("TE"). TE has been a leader and innovator for many years in developing technology for module-level rapid shutdown of

photovoltaic ("PV") panels. TE's products include module-level rapid shutdown units that attach to PV panels. TE has delivered more than 2 million rapid shutdown products to end users.

4. For more than a decade, TE has focused on module-level technologies that address long-recognized challenges in PV system operation, including safe shutdown, system monitoring, and coordinated control across diverse system architectures. As a result of its pioneering work TE was awarded multiple patents related to module-level rapid shutdown and has participated in industry efforts addressing the implementation and interoperability of rapid-shutdown technologies. TE has been active in enforcing and licensing its patents, including the Tigo Patents.

5. Tigo holds and enforces patents originating with TE, including the Tigo Patents. Tigo has acquired all rights and title to the Tigo Patents.

6. The Tigo Patents generally relate to technologies used in photovoltaic systems to monitor, control, communicate with, and safely manage PV modules and the electrical power generated by those modules.

7. In a typical solar installation, PV systems use power electronics to convert and manage the electricity generated by PV modules for use in homes and delivery to the electric grid.

8. The Tigo Patents disclose improvements to the way such systems monitor, control, communicate with, and safely manage solar modules and the electrical power generated by those modules.

9. Among other things, the Tigo Patents address technological problems arising from the distributed nature of solar installations. Solar modules may be physically distributed throughout a rooftop or other installation site, electrically interconnected in various configurations, and coupled to one or more inverters or controllers. The patents disclose, for example, systems and methods for controlling output from solar modules; communicating over power lines; monitoring system status, electrical conditions, and module performance; limiting voltage or

power output; identifying and authenticating module-level devices; supplying auxiliary power to controller and communications circuitry; and automatically shutting down, disconnecting, bypassing, or reducing the output of solar panels under specified conditions, including abnormal, emergency, or communication-loss conditions.

10. These improvements are important because solar-energy systems must operate efficiently under changing environmental and electrical conditions while also satisfying safety, monitoring, communication, and grid-interconnection requirements. The technologies disclosed in the Tigo Patents improve the ability of a solar-energy system to coordinate module-level devices, manage voltage and power output, transmit control and sensor information across existing power wiring, and respond to system conditions without requiring dedicated communication wiring or purely centralized control.

11. SolarEdge makes, uses, sells, offers for sale, and/or imports solar-energy products and systems that include module-level and system-level power electronics used to control, convert, monitor, communicate with, and/or safely shut down PV modules and PV arrays. These products include SolarEdge's power optimizers, inverters, and associated software or firmware used in residential, commercial, and/or utility-scale solar installations (the "Accused Products").

12. While a number of other companies that manufacture and sell solar-energy products and systems have licensed the Tigo Patents, SolarEdge has not. Tigo attempted to resolve SolarEdge infringement without litigation and approached SolarEdge to take a license to Tigo's patented technology. SolarEdge never responded. In light of existing licensees paying for the right to utilize Tigo's innovative technology, and SolarEdge's ongoing violations of Tigo's intellectual property rights, Tigo initiated this litigation against SolarEdge.

13. SolarEdge has directly infringed and continues to directly infringe one or more claims of the Tigo Patents, as alleged in the patent-specific counts below, by making, using, selling,

offering to sell, and/or importing Accused Products that embody asserted apparatus and computer-readable-storage-medium claims; making and using complete SolarEdge systems that meet asserted system claims; and using the Accused Products and complete systems in ways that perform asserted method claims.

14. SolarEdge has also indirectly infringed and continues to indirectly infringe one or more claims of the Tigo Patents, as alleged in the patent-specific counts below. SolarEdge has actively induced infringement by intentionally instructing, encouraging, and assisting distributors to sell and supply accused articles and installers, customers, and end users to assemble, install, configure, commission, operate, test, and use the Accused Products in complete infringing systems and in the performance of claimed methods. SolarEdge has also contributed to infringement by supplying particular circuitry, firmware, software, and configured components identified below that constitute material parts of the claimed inventions, are especially made or adapted for use in infringement, and are not staple articles or commodities of commerce suitable for substantial noninfringing use in their accused configurations.

15. Tigo seeks damages and other relief for SolarEdge's infringement of the Tigo Patents. During the applicable damages periods, Tigo, its predecessors in interest, and licensees complied with 35 U.S.C. § 287(a) to the extent applicable, as further alleged below. Tigo also asserts method claims and seeks damages on those claims to the extent § 287(a) does not apply.

16. Marking under 35 U.S.C. § 287(a) is relevant to each of the Tigo Patents to the extent Tigo asserts one or more claims under each patent directed to a patented article, including a system, apparatus, photovoltaic panel, or non-transitory computer-readable storage medium.

17. During the applicable damages periods, Tigo and its predecessors in interest, including Tigo Energy, Inc., complied with 35 U.S.C. § 287(a) with respect to the '172, '241, '321, '021, '385, '770, '403, and '278 Patents. Substantially all products practicing those patents that

were made or sold by or for the applicable patent owner were appropriately marked as required by the statute, including through virtual marking where applicable. For example, the virtual-marking page at https://www.tigoenergy.com/patents identifies Tigo-branded rapid-shutdown products and associates those products with the applicable patent numbers.

18. Licenses under the Tigo Patents require licensees to mark licensed products in compliance with 35 U.S.C. § 287(a). Compliance with those requirements has been reasonably monitored by Tigo and prior owners of the Tigo Patents. Based on those marking requirements and monitoring practices, all or substantially all licensed products practicing the Tigo Patents were appropriately marked as required by the statute, including through virtual marking where applicable. For example, the virtual-marking page at https://www.tigoenergy.com/rsdvirtualmarking identifies relevant licensees and licensed products and associates those products with the applicable patent numbers.

19. SolarEdge received actual notice of Tigo's specific infringement allegations no later than the filing and service of this Complaint and had earlier patent-specific knowledge as alleged below.

**A. Solar Systems and Rapid-Shutdown Technology**

20. A residential rooftop solar PV system includes multiple subsystems that operate together to convert sunlight into usable household electricity. First, PV modules (colloquially referred to as solar panels) contain semiconductor cells that generate direct current ("DC") electricity when exposed to sunlight through the photovoltaic effect. Second, one or more inverters convert that DC electricity into alternating current ("AC"), which is the standard form of electricity used by residential loads and required for interconnection with the utility grid. Third, the system includes balance-of-system components such as DC and AC wiring, junction boxes, disconnects, mounting hardware, and monitoring equipment that electrically and mechanically integrate the PV

modules and inverter into the home's electrical system. *See, e.g.*, U.S. Dep't of Energy, *How Does Solar Work?*, https://www.energy.gov/cmei/systems/how-does-solar-work (last visited Aug. 6, 2026); U.S. Dep't of Energy, *Solar Photovoltaic System Design Basics*, https://www.energy.gov/cmei/systems/solar-photovoltaic-system-design-basics (last visited Aug. 6, 2026).

21. PV systems include electrical conductors and components on or within buildings that may present electrical hazards while the system is generating, storing, converting, or delivering power. During emergencies, grid outages, disconnection events, or maintenance, first responders or service personnel may need access to the areas where the PV array, associated wiring, or other system equipment are installed without risk of electrocution. To address this problem, the industry has adopted safety architectures that allow voltage in controlled PV-system conductors and equipment to be reduced to prescribed levels when required. These features are commonly referred to as "rapid shutdown" functionality.

22. Rapid shutdown is a safety feature designed to quickly reduce voltage in controlled PV-system conductors to prescribed levels following rapid-shutdown initiation, such as when utility power is lost, an emergency disconnect is activated, or first responders require access to the area. Rapid shutdown is intended to mitigate the risk of electric shock to firefighters, installers, inspectors, and homeowners during emergency or maintenance situations. *See* Nat'l Fire Prot. Ass'n, *NFPA 70*, *National Electrical Code* § 690.12 (2023) ("NEC").

23. Rapid shutdown may be implemented through module-level power electronics ("MLPE"), including microinverters, power optimizers, and dedicated rapid-shutdown devices located at or near individual PV modules. When rapid shutdown is triggered, the voltage outside a defined boundary (generally at or near the array) is reduced to levels specified by applicable

electrical safety standards, while allowing normal power generation and grid interaction during standard operation. *See* NEC § 690.12.

24. Several of the Tigo Patents relate to and cover technologies that enable this module-level control by combining distributed devices located at individual PV modules with centralized signaling or control mechanisms that coordinate system operation. Other Tigo Patents address complementary technologies, including for example communicating data over power conductors, authenticating module-level devices and efficiently supplying auxiliary power to control circuitry.

**B. Distributed Monitoring, Command, and Watchdog Architecture**

25. Several of the Tigo Patents disclose distributed solar-control architectures in which a master, remote, or system-level controller communicates with module-level devices and monitors communications, sensors, or system conditions. Depending on the particular architecture, the system-level controller may evaluate monitored conditions, determine whether a change in operation is required, and communicate with module-level devices to implement a responsive control action. *See, e.g.*, Ex. 6 ('770 Patent) at col. 19, ll. 6-47.

26. In implementations relevant to the asserted claims, a master, remote, or system-level controller receives or monitors information concerning sensor or system conditions, determines whether an operational response is required, and communicates with module-level devices to implement that response. The module-level devices respond by controlling associated power-conversion circuitry or module output, including by limiting production, changing an operating state, or shutting down output when required. *See, e.g.*, *id*. at 19:35-38.

27. These distributed-control architectures allow system-level conditions to be evaluated while responsive action is implemented at or near individual PV modules. They enable coordinated control across many modules and support rapid responses to abnormal or emergency conditions, production limiting, safe shutdown, and other system-control functions.

28. The inventions claimed in several of the Tigo Patents protect multiple variations of these distributed-control technologies. Depending on the particular patent and claim, the claimed functionality may include monitoring sensors or system conditions, detecting anomalies, determining whether a control change is required, issuing responsive control commands, limiting or shutting down module output, communicating over power conductors, or identifying and authenticating module-level devices.

**C. Commercial Deployment, Practical Implementation, and Alignment with Industry Standards and Safety Requirements**

29. The inventions claimed in the Tigo Patents have been implemented in commercially deployed PV systems and embodied in products designed for installation at scale. These products include module-level devices installed in proximity to PV panels and associated signaling components used to coordinate system-wide operation.

30. Many commercially deployed PV products that practice the Tigo Patents are manufactured and sold under license from Tigo. Tigo's virtual-marking page identifies many of those licensees and licensed products and associates the identified products with the applicable Tigo Patents. *See* https://www.tigoenergy.com/rsdvirtualmarking.

31. Through commercial deployment, these solutions enable PV installations to meet applicable safety requirements while preserving normal system performance during routine operation. The widespread use of such architectures in real-world installations demonstrates that the technologies claimed in the Tigo Patents provide practical, concrete engineering solutions to longstanding problems in PV system safety and control.

32. PV system safety requirements in the United States are reflected in the NEC, including § 690.12, which requires PV systems installed on or in buildings to include a rapid-shutdown function to reduce shock hazards for emergency responders.

33. To support compliance with these requirements across multi-vendor systems, industry participants have developed interoperability specifications and certification programs, including those promoted by the SunSpec Alliance. These efforts seek to define standardized system architectures and communication behaviors that allow inverters, transmitters, and module-level devices from different manufacturers to operate together in a safe and predictable manner.

34. For example, the SunSpec Communication Signal for Rapid Shutdown ("RSD") Specification defines "a multi-vendor, multi-device" communication interoperability specification to support NEC 2014, NEC 2017, and UL 1741 module-level rapid-shutdown requirements.

35. The SunSpec RSD Specification describes a rapid-shutdown communication system that includes initiators, transmitters, and receivers. During normal operation, a transmitter sends a "permission to operate" signal to module-level receivers. When rapid shutdown is initiated, the transmitter stops sending that signal and the receivers respond by reducing voltage at the module level.

36. This architecture, which combines centralized signaling with distributed module-level response, illustrates the importance of reliable communications and coordinated device-level control to the safe and interoperable operation of PV systems. TE developed and patented important technologies addressing these and other challenges associated with rapid shutdown and module-level control.

37. TE actively participated in the SunSpec rapid-shutdown specification process. The SunSpec RSD Specification identifies TE personnel among the companies and individuals involved in that process, including Gal Bauer, Vered Sharon, Bijay Shrestha, and Danny Eizips.

38. In connection with that participation, TE notified SunSpec that TE held patents covering technologies relevant to the rapid-shutdown systems addressed through the SunSpec

process. Those disclosures informed SunSpec and participating members of TE's patent rights concerning rapid-shutdown technology.

39. A SunSpec Member's Briefing dated November 1, 2017, documented TE's identification of patent claims in connection with the SunSpec RSD Specification, including claims 1, 9, and 17 of the '172 Patent, among others. https://sunspec.org/wp-content/uploads/2019/08/SunSpecRapidShutdownBriefing20171101.pdf.

40. TE subsequently provided additional notice concerning patents issued after its initial disclosure. In correspondence dated May 20, 2021, TE identified additional rapid-shutdown patents relevant to the technologies addressed by the SunSpec RSD Specification, including the '770 Patent. Ex. 6.

41. On information and belief, TE's participation and disclosures made its rapid-shutdown innovations and associated patent rights known within the PV industry, including among companies participating in the development and implementation of rapid-shutdown technologies.

42. SolarEdge separately obtained actual knowledge of Tigo's patent rights no later than its 2026 licensing correspondence with Tigo. On January 2, 2026, Tigo informed SolarEdge of the Tigo Patents.

43. Despite its knowledge of Tigo's patent rights, SolarEdge has not obtained a license to the Tigo Patents and has continued the acts of infringement alleged below.

**D. The Tigo Patents**

44. The Tigo Patents generally relate to complementary technologies for the safe, reliable, and coordinated operation of distributed PV systems. These patents disclose, among other things, systems and methods for monitoring electrical and system conditions; controlling or limiting solar-module output and PV-system voltage; issuing control commands in response to detected anomalies; communicating data over photovoltaic power conductors; identifying and

authenticating module-level devices; and reliably supplying auxiliary power to control circuitry. Although directed to different aspects of PV-system operation, the patents share a common focus on coordinating system-level and module-level components to communicate, control power production, and respond appropriately when communications are lost, an abnormal or emergency condition is detected, or specified operating conditions are not satisfied.

45. More specifically, the ’172 Patent, entitled *Systems and Method for Limiting Maximum Voltage in Solar Photovoltaic Power Generation Systems*, was duly and legally issued on September 25, 2012. Tigo is the owner and assignee of all substantial rights in the ’172 Patent.

46. The ’172 Patent addresses a related problem in PV systems: controlling or limiting voltage in a PV system so that the voltage does not exceed regulatory or safety limits. The ’172 Patent discloses monitoring voltage and limiting the voltage output of one or more solar modules based on a maximum regulatory or safety voltage. The patent teaches that a controller, local management units, or a controlling local management unit can monitor currents or voltages, analyze whether a voltage threshold may be exceeded, and control module output to prevent voltages from exceeding safety limits.

47. The ’241 Patent, entitled Systems and Methods for Using a Power Converter for Transmission of Data Over the Power Feed, was duly and legally issued on October 14, 2014. Tigo is the owner and assignee of all substantial rights in the ’241 Patent.

48. The ’241 Patent addresses power-line communications in photovoltaic systems. The patent discloses using a controller to control switching circuitry in a power converter and modulating that control with data so that the data is transmitted over the same power conductors used to deliver energy from the photovoltaic system.

49. The ’321 Patent, entitled *Systems and methods for an enhanced watchdog in solar module installations*, was duly and legally issued on January 13, 2015. Tigo is the owner and assignee of all substantial rights in the ’321 Patent.

50. The ’321 Patent describes a system for “rendering a solar array safe during an emergency” that involves a “watchdog unit” that “monitors a signal from a central controller” and shuts down solar modules if the signal “is lost, interrupted, or becomes irregular, or if a shutdown signal is received.” The ’321 patent discloses that a local control can disconnect a solar module from a central controller when it determines that a predetermined period of time has passed, with time being measured in numbers of “skips” detected by the watchdog device.

51. The ’321 Patent has been the subject of two *inter partes* review petitions. In IPR2021-00541, the petitioner challenged claims 1, 5-7, 12, and 13, but the PTAB dismissed the petition without instituting review after the parties settled. *Altenergy Power Systems Inc. v. Tigo Energy Inc.*, IPR2021-00541, Paper 8 (P.T.A.B. May 3, 2021). IPR2021-01286, SunSpec Alliance challenged these same claims. The PTAB found that SunSpec had not demonstrated the unpatentability of any of the challenged claims. The Federal Circuit affirmed the PTAB’s decision as to two grounds for the’321 Patent, and the parties settled thereafter. *SunSpec Alliance v. Tigo Energy, Inc.*, IPR2021-01286, Paper 27 (P.T.A.B. Jan. 26, 2023), aff’d in part, Nos. 2023-1741, 2023-1742, slip op. at 9 (Fed. Cir. Aug. 5, 2025) (nonprecedential); Paper 34 (P.T.A.B. Nov. 4, 2025).

52. The ’021 Patent, entitled *System and method for enhanced watch dog in solar panel installations*, was duly and legally issued on November 7, 2017. Tigo is the owner and assignee of all substantial rights in the ’021 Patent.

53. The ’021 Patent is directed to the automated shutdown, disconnect, or power reduction of solar panels. The patent discloses master management units and localized module

controls to manage safety protocols, acting as an enhanced "watch dog" system during grid failures or emergencies. In particular, the '021 patent discloses that localized modules can shut down when the system detects an "anomaly," such as skips of heartbeat signals from the master management unit.

54. The '385 Patent, entitled Identification Protocol Between a Local Controller of a Solar Module and a Master Controller, was duly and legally issued on November 20, 2018. Tigo is the owner and assignee of all substantial rights in the '385 Patent.

55. The '385 Patent addresses identification and authentication functionality involving multiple local management units associated with solar modules and a master management unit. The claimed technologies include communicating identification codes, receiving authentication of those codes, and continuing active operation of the authenticated local management units, including continued operation according to their normal or default profiles or configurations.

56. The '770 Patent, entitled *System and Method for Enhanced Watch Dog in Solar Panel Installations*, was duly and legally issued on April 9, 2019. Tigo is the owner and assignee of all substantial rights in the '770 Patent.

57. The '770 Patent discloses distributed solar-control architecture using one or more master management units and one or more local management units. In the disclosed system, the master management units communicate with local management units during operation. The master units may be connected to controllers and emergency detection sensors, and, when a sensor detects an emergency, the master unit can instruct associated local units to take action. If communications with the master unit are cut off, the local management units can independently shut down, disconnect, or reduce output from associated PV modules.

58. The '770 Patent has been the subject of two *inter partes* review petitions. In IPR2021-00540, the petitioner challenged claims 12–16, but the PTAB dismissed the petition

without instituting review after the parties settled. *Altenergy Power Systems Inc. v. Tigo Energy Inc.*, IPR2021-00540, Paper 8 (P.T.A.B. May 3, 2021). In IPR2021-01287, SunSpec Alliance challenged claims 12–16. The PTAB determined claims 12 and 13 unpatentable but found that SunSpec had not demonstrated the unpatentability of claims 14–16. The Federal Circuit affirmed the PTAB's decision as to all grounds concerning the '770 Patent. *SunSpec Alliance v. Tigo Energy, Inc.*, IPR2021-01287, Paper 27 (P.T.A.B. Jan. 30, 2023), aff'd, Nos. 2023-1741, 2023-1742, slip op. at 9 (Fed. Cir. Aug. 5, 2025) (nonprecedential).

59. The '403 Patent, also entitled *System and Method for Enhanced Watch Dog in Solar Panel Installations*, was duly and legally issued on June 16, 2020. Tigo is the owner and assignee of all substantial rights in the '403 Patent.

60. The '403 Patent discloses a photovoltaic panel having photovoltaic cells, a power converter, and a controller that communicates with a remote unit, including by receiving heartbeat signals. The controller can detect an anomaly in those heartbeat signals—including skipped heartbeat signals—and reduce, shut down, or disconnect the power output of the photovoltaic panel.

61. The '278 Patent, also entitled *System and Method for Enhanced Watch Dog in Solar Panel Installations*, was duly and legally issued on January 18, 2022. Tigo is the owner and assignee of all substantial rights in the '278 Patent.

62. The '278 Patent discloses related solar-panel control and safety functionality, including the use of master and local management units to provide automated shutdown, disconnect, or power-reduction functions. A local controller determines whether a communication from a central controller has been interrupted for a time period longer than the number of allowed skips, and a switch disconnects the solar module from the power bus in response.

**SOLAREDGE'S INFRINGEMENT**

63. SolarEdge makes and sells equipment used in residential systems for generating solar energy. SolarEdge's systems convert sunlight into electricity for residential use. SolarEdge systems use PV panels to capture energy in the form of photons and convert them into electricity.

64. PV panels (also called solar panels) output direct-current (DC) electricity. By contrast, household electrical systems typically use alternating-current (AC) electricity. Residential solar systems, therefore, use one or more inverters to convert the DC electricity to AC electricity. Unused energy captured by the PV panel can be stored in a battery or sent to the electrical grid for later use.

65. SolarEdge describes itself as "a global leader in renewable energy technology, delivering smart solar solutions across residential, commercial, industrial, and utility-scale sectors." *See* https://corporate.solaredge.com/en/about-us.

66. Founded in 2006, its portfolio of products includes PV inverters, power optimizers, energy storage systems, EV charging, and grid services supported by intelligent software platforms for monitoring, management, and optimization. *Id.*

67. SolarEdge currently offers at least an S-Series line of power optimizers, including at least the S440, S500, S500B, and S650B; a P-Series line of power optimizers, including at least P320, P320-ZEP, P340, P370, P400, P400-ZEP, P401, P405, P485, and P505; and a U-Series line of power optimizers, including at least the U650 and U650B. These products are collectively referred to as the "Accused Power Optimizers."

68. An example of an S-Series power optimizer is shown below:




69. The Accused Power Optimizers are DC/DC converters that attach "to each solar module, effectively turning them into smart modules." *See* https://www.solaredge.com/za/solaredge-blog/power-optimizers.

70. The Accused Power Optimizers are touted by SolarEdge as maximizing energy production by performing individual Maximum Power Point Tracking ("MPPT") for each panel. *Id.* According to SolarEdge, this mitigates shading losses, enables module-level monitoring, and improves safety via automatic voltage reduction. *Id.*

71. SolarEdge also currently offers at least three general types of residential inverters: the SolarEdge Home Hub Inverter (including at least models SE3800H-US, SE5700H-US, SE7600H-US, SE10000H-US, and SE11400H-US), the SolarEdge Home Wave Inverter (including at least models SE3000H-US, SE3800H-US, SE5000H-US, SE5700H-US, SE6000H-US, SE7600H-US, SE10000H-US, and SE11400H-US), and the Nexis Inverter (including at least models NX3800T-US, NX5700T-US, NX7600T-US, NX9600T-US, NX10000T-US, NX11500T-US, and NX13000T-US). These products are collectively referred to as the "Accused Inverters."

72. Examples of the Accused Inverters are shown below:







73. The Accused Inverters function as the "brains" of the SolarEdge residential solar energy system. *See* https://www.solaredge.com/us/products/residential/pv-inverters/solaredge-home-hub-inverters. They convert solar DC power into the AC power used in the home while managing storage, backup and smart devices using the SolarEdge Home Operating System. *Id.*

74. SolarEdge also markets and configures Accused Inverters as grid-interactive inverters that comply with applicable grid-interconnection standards, including IEEE 1547 and UL 1741. *See, e.g.*, *id.*; https://knowledge-center.solaredge.com/sites/kc/files/ieee-utility-required-profile-grid-code-support-setapp-application-note.pdf.

75. SolarEdge has shipped more than 140 million power optimizers and more than 6.9 million inverters. https://www.solaredge.com/en/about-us.

76. On information and belief, SolarEdge's sales of Accused Power Optimizers and Accused Inverters in the United States generates millions of dollars in revenue annually.

**A. The Accused Products**

77. The Accused Products function within SolarEdge's residential photovoltaic platform. This platform relies on a DC-optimized inverter architecture. In a typical residential installation, each solar module is connected to a SolarEdge power optimizer, the optimizers are connected in DC strings, and the strings feed a SolarEdge inverter. SolarEdge describes the typical system as including "inverters, power optimizers, a communication device" for access to a cloud-based monitoring platform, and, in many installations, additional smart-energy-management

components. *See* https://www.sec.gov/Archives/edgar/data/1419612/000117891326002201/zk2635126.pdf.

78. A SolarEdge system includes a string bus, which carries energy from the solar modules to a voltage output. *See* https://www.solaredge.com/sites/default/files/se-single-and-three-phase-inverter-quick-installation-guide-na.pdf:



**Connecting Power Optimizers in a String**

1 Connect the power optimizer outputs in series: Connect the Minus (-) output connector of the string's first power optimizer to the Plus (+) output connector of the string's second power optimizer. Connect the rest of the optimizers in the string in the same way.

- The minimum and maximum string length should be according to the power optimizer datasheet.
- Strings ***DO NOT*** have to be of equal length.

2 Verify proper connection of power optimizers: Before the inverter is turned ON, each power optimizer produces *1V safety-voltage*. Use a voltmeter to verify it for each string using a voltmeter. The voltage on a string is the number of modules multiplied by 1V, with a deviation of 10mV per module. Make sure the modules are exposed to sunlight during this process.

**NOTE:**
If several strings are connected in parallel, verify voltage for each string separately.

https://knowledge-center.solaredge.com/sites/kc/files/se_application_fixed_string_voltage.pdf:






79. SolarEdge shifts certain module-level control functions out of the inverter and into the power optimizers, while retaining DC-to-AC conversion and grid interaction in the inverter. SolarEdge describes this architecture as one in which the optimizers provide module-level MPPT and voltage/current adjustment, while the inverter performs DC-to-AC conversion and communicates optimizer data to the monitoring platform.

**B. SolarEdge Power Optimizers**

80. As discussed above, an Accused Power Optimizer is a module-level DC/DC converter. It is typically attached to, or mounted immediately adjacent to, a PV module. The Accused Power Optimizer receives DC power from the module and uses module-level control electronics to condition that DC power before delivering output power into the DC string. SolarEdge describes its Accused Power Optimizers as high-efficiency, single-stage DC-to-DC converters controlled by ASIC devices. *See* https://www.solaredge.com/sites/default/files/solaredge-system-design-nec.pdf.

81. In a SolarEdge system, each Accused Power Optimizer attempts to operate its associated PV module at or near that module's maximum power point, even where other modules in the same string are shaded, soiled, mismatched, differently oriented, or otherwise operating

under different electrical conditions. SolarEdge describes this as module-level MPPT that allows each module to produce its maximum power potential independently of other modules in the same string. *Id.*; *see also* https://www.solaredge.com/us/products/residential/power-optimizers:




https://www.solaredge.com/en/products/residential/power-optimizers:




82. In performing MPPT, the Accused Power Optimizer decouples the electrical operating point of the PV module from the electrical operating point of the string. SolarEdge explains that the DC-to-DC converter in the Accused Power Optimizer allows the module-side input voltage and current to be "completely decoupled" from the optimizer output voltage and

current. *Id.* In practical terms, the optimizer can draw voltage/current from the module at a module-specific maximum-power operating point while providing a different voltage/current contribution to the series string.

### C. SolarEdge Inverters

83. The Accused Inverter, in turn, receives DC power from one or more strings of optimizers and converts that DC power into grid-compatible AC power. SolarEdge describes its Accused Inverter as using high-efficiency, single-stage, transformerless conversion topology, and as containing digital control technology for efficient DC-to-AC conversion and grid interaction. *Id.*; *see also* https://ressupply.com/documents/solaredge/SE3000H-SE11400H-US000BNX4_Installation_Guide.pdf:

## Chapter 1: Introducing the SolarEdge Power Harvesting System

The SolarEdge power harvesting solution maximizes the power output from any type of solar photovoltaic (PV) installation while reducing the average cost per watt. The following sections describe each of the system's components.




Figure 1: The SolarEdge power harvesting system components

84. The Accused Inverter also functions as a system controller and communications gateway. SolarEdge states that the Accused Inverter receives monitoring data from the Accused Power Optimizers, stores that data, and transmits it to SolarEdge's monitoring server when an internet connection is available. *See*, *e.g.,* https://www.sec.gov/Archives/edgar/data/1419612/000117891326002201/zk2635126.pdf. The

monitoring platform can then provide module-level, string-level, inverter-level, and system-level visibility, including power, voltage, current, and status data. *Id.*

85. At the Accused Inverter level, the Accused Inverter regulates the DC input bus/string voltage. SolarEdge explains that, when used with Accused Power Optimizers, the Accused Inverter operates at a fixed DC input voltage, which differs from traditional string systems where the inverter itself performs string-level MPPT. *See, e.g.*, https://www.solaredge.com/sites/default/files/solaredge-system-design-nec.pdf.

**D. SolarEdge System Operation**

86. Communication between the Accused Power Optimizers and the Accused Inverter is accomplished over the DC conductors using power line communication, or PLC. https://knowledge-center.solaredge.com/sites/kc/files/se-prevent-pv-system-crosstalk-white-paper-nam.pdf. Each power optimizer transmits data over the DC power line. https://gridalternatives.org/sites/default/files/se_power_optimizers_installation_guide.pdf.

87. On information and belief, SolarEdge's PLC implementation uses the existing DC string wiring both to carry power and to carry encoded communications between Accused Power Optimizers and the Accused Inverter.

88. For example, The SolarEdge system is activated and commissioned – "During the activation and commissioning, the inverter discovers and communicates with all connected components in the solar system, such as: Power Optimizers." *See, e.g.*, https://knowledge-center.solaredge.com/sites/kc/files/se-commercial-3ph-inverter-tech-installation-nam-guide.pdf, 55.

89. On information and belief, the SolarEdge system regulates the voltage output of the accused Power Optimizers based on their communications with the Accused Inverters via SolarEdge's PLC implementation.

90. The Accused Power Optimizers include a variety of internal components, including a current transformer; a capacitor electrically connected to one of the inputs and located between the PV panel and current transformer; a microcontroller; a buck/boost converter; a plurality of FETs; and internal memory, among others.

91. The Accused Power Optimizers also includes various connections between the internal components of the Accused Power Optimizers, as well as connections with other components of a SolarEdge system, which connections can convey signals to such internal or external components.

92. Following physical installation, the Accused Power Optimizers must be paired to the installed Accused Inverter and must be commissioned. *See* https://www.youtube.com/watch?v=KhRrJM8AoeI; https://www.youtube.com/watch?v=hYgqlzkRz8A; *see also* https://knowledge-center.solaredge.com/sites/kc/files/se-commercial-3ph-inverter-tech-installation-nam-guide.pdf:

> **Pairing**
>
> Once all connections are made, all the Power Optimizers must be paired with the inverter. This section describes how to assign the Power Optimizers to the inverter. The pairing process takes place during the first activation of the inverter. The pairing process is automatically triggered after the commissioning process. In some cases, where Power Optimizers are replaced, proactive pairing process is required.
>
> To activate the proactive pairing process:
>
> 1. From the Commissioning menu, select Pairing.
> 2. Tap Start Pairing.
> 3. When Pairing Complete is displayed, the system startup process begins:
>
>    Since the inverter is ON, the Power Optimizers start producing power and the inverter starts converting AC.

93. SolarEdge's rapid shutdown and SafeDC functionality relies on the interaction between the Accused Inverter and the Accused Power Optimizers. *See, e.g.*, https://www.solaredge.com/sites/default/files/se-single-phase-energy-hub-prism-technology-installation-guide-na.pdf. Each Accused Power Optimizer is configured to reduce its output to 1

volt unless it receives a signal from a functioning inverter. Thus, when the Accused Inverter is shut down, loses AC power, detects a fault, or otherwise ceases normal operation, the Accused Power Optimizers default to a reduced-voltage safe state. *See* https://ressupply.com/documents/solaredge/SE3000H-SE11400H-US000BNX4_Installation_Guide.pdf; *see also* https://knowledge-center.solaredge.com/sites/kc/files/solaredge_fire_and_solar_pv_systems_flyer.pdf:

**SafeDC™ reduces the risk of working around damaged cables**

To decrease DC voltage to a safe level, SolarEdge inverters are designed to automatically switch into safety mode when AC is shutdown. This built-in SafeDC™ feature ensures that the output voltage of each module is reduced to a touch-safe 1V whenever AC power is off.*




**Why SolarEdge PV systems compare more favorably against traditional inverters**

| SolarEdge System | Traditional Inverters |
|---|---|
| SafeDC™ is always on and embedded in the technology. | Even when the inverter is shutdown, there is still high voltage in the wiring, making it unsafe to the touch. |
| When there is no communication between the inverter and power optimizer, the default output voltage of each power optimizer is 1V per module. | Rooftop array disconnect switches only terminate the flow of current from the roof to the inverter. The modules on the roof, their cabling, and the cabling all the way to the inverter remain energized and dangerous while there is daylight. |
| SolarEdge inverters are designed to identify arc detections and subsequently shut down, in compliance with UL1699B arc detection standard. | Third-party arc fault detectors are usually required, adding further costs and installation effort. |

94. During rapid shutdown, SolarEdge's module-level safety architecture causes the Accused Power Optimizers to stop providing normal string voltage and to enter SafeDC mode. A 2025 report describing SolarEdge's system states that SafeDC is designed to reduce high DC voltage to safe levels during wake-up, maintenance, fault conditions, and emergency situations, and that SolarEdge's module-level rapid-shutdown function de-energizes each module individually by causing the optimizers to enter SafeDC rather than relying only on centralized shutdown at the inverter. *See* https://www.vde.com/resource/blob/2386102/dd880651470c61e0e5ecb25a7f256402/solaredge-

report-2025-data.pdf; https://corporate.solaredge.com/en/news-and-media/local-announcements/vde-report.

95. SolarEdge's rapid-shutdown functionality is designed to reduce system voltage within a short time window. The 2025 report discussed above states that SolarEdge's system reduces system voltage to a safe level within 30 seconds, and SolarEdge's own safety materials state that rapid shutdown reduces power in the modules and string wires to 1 volt within 30 seconds so firefighters and first responders can work safely.

96. SolarEdge describes the Accused Power Optimizer as reducing output to 1 volt unless it receives "a fail-safe signal from a functioning inverter." *See* https://www.sec.gov/Archives/edgar/data/1419612/000117891326002201/zk2635126.pdf. Thus when the Accused Inverter is functioning and the system is allowed to produce power, the Accused Power Optimizers may operate at production voltage; when the signal is absent because the Accused Inverter is off, disconnected, faulted, or not functioning, the Accused Power Optimizers revert to their low-voltage safe output.

97. The Accused Power Optimizers comply with NEC § 690.12 and contain rapid shutdown technology, *see* https://knowledge-center.solaredge.com/sites/kc/files/se-ul3741-compliance-se-dc-optimization-architecture-application-note-nam.pdf, which requires reduction of voltage to no more than 30 volts within 30 seconds of rapid shutdown initiation.

98. In summary, the SolarEdge residential system uses a distributed-control architecture in which Accused Power Optimizers perform module-level DC/DC conversion, MPPT, voltage/current adjustment, monitoring, PLC communication, and safety shutdown functions, while the Accused Inverter performs regulated DC-bus control, DC-to-AC conversion, grid interconnection, communications aggregation, monitoring-server communication, and rapid-shutdown coordination.

**E. SolarEdge's Relationship with Installers**

99. SolarEdge prescribes the manner and sequence in which its products are installed, connected, configured, paired, commissioned, activated, registered, monitored, and serviced through its product designs, installation manuals, quick-install guides, and other installer documentation. SolarEdge's installation materials establish workflows for connecting Power Optimizers and Accused Inverters, activating and commissioning Accused Inverters, pairing Power Optimizers, selecting country and grid settings, configuring communications and power-control settings, recording component serial numbers and physical locations, and connecting completed systems to SolarEdge's monitoring platform. *See, e.g.*, https://knowledge-center.solaredge.com/en/installation-guide-three-phase-inverter-north-america. SolarEdge's current limited warranty also excludes products damaged as a result of improper installation. See https://knowledge-center.solaredge.com/sites/kc/files/SE-Limited-Product-Warranty-January-2026-final.pdf.

100. SolarEdge implements and reinforces these prescribed workflows through SetApp, SolarEdge Go, Mapper, Designer, the SolarEdge monitoring platform, and related applications and services. SolarEdge instructs installers to use SetApp to commission Accused Inverters, pair Power Optimizers, select required grid settings, configure communications and power-control settings, validate system installation, and place completed systems into operation. SolarEdge describes SetApp pre-commissioning as enabling installers to identify wiring, communication, isolation, and direct-current-polarity issues before leaving the site. *See, e.g.*, https://www.solaredge.com/us/products/commercial/pv-inverters/three-phase-with-synergy; https://www.solaredge.com/us/support/firmware-release-notes/commercial-inverters-firmware. SolarEdge likewise describes SolarEdge Go as bringing together SetApp, Mapper, and Monitoring to support installation, commissioning, site and device registration, configuration, fleet

management, remote diagnostics, firmware updates, and support-ticket management. *See* https://www.solaredge.com/us/products/software-tools/solaredge-go.

101. SolarEdge approves installer registrations for access to its monitoring platform and related installer services. After approval, SolarEdge directs installers to register completed sites in the monitoring platform and permits installers to use their SolarEdge credentials to access EDGE Academy, the Support Center, Designer, and the Alliance Program. *See* https://www.solaredge.com/us/registration-complete. SolarEdge identifies the installer as the administrator of each customer's monitoring account and directs the installer to create the site, build the site layout, invite the customer as a user, determine the customer's access level, and configure system alerts. SolarEdge maintains the monitoring servers through which those activities occur. See https://www.solaredge.com/us/support/system-owner/create-a-monitoring-platform-account; https://www.solaredge.com/us/support/system-owner/first-time-log-in.

102. SolarEdge further reinforces its installation and commissioning requirements through EDGE Academy training and certification programs, technical and service support, warranty and return-material-authorization procedures, and installer programs. SolarEdge requires Home Hub Certification for installers to receive SolarEdge support for Home Hub inverter installations and service. SolarEdge similarly requires Home Battery Certification to purchase SolarEdge Home Batteries and receive SolarEdge support for Home Battery installations and service. *See* https://www.solaredge.com/us/installers/training/certifications.

103. SolarEdge also conditions valuable installer benefits on the installation and registration of SolarEdge systems. SolarEdge states that installers already installing SolarEdge products weekly may qualify for its Preferred Partner Program. Program benefits include use of a SolarEdge partner logo, product promotions, event invitations, customized training, placement in SolarEdge's Preferred Installer Directory, lead generation, public endorsement, and training that

permits participants to repair and replace units through SolarEdge's No-Call RMA process. *See* https://www.solaredge.com/us/installers/3p. SolarEdge's Alliance Program separately awards installers points for each kilowatt of SolarEdge system capacity that they install and register on the monitoring platform. *See* https://www.solaredge.com/us/registration-complete.

104. On information and belief, SolarEdge maintains and uses records concerning installer-account approvals, training and certifications, registered sites, installed system capacity, system components and identifiers, site configurations, commissioning and activation activity, monitoring data, support and warranty requests, program eligibility, and program benefits. SolarEdge publicly acknowledges collecting and processing information from installers and other monitoring-platform users, including account and registration information, site and device configurations, system identifiers, energy-production information, and usage information. *See* https://www.solaredge.com/us/privacy-policy. These records and related determinations are uniquely within SolarEdge's possession and control. SolarEdge establishes the manner and sequence of the relevant installation, pairing, configuration, commissioning, registration, activation, and monitoring conduct through the instructions and technological workflows alleged above. SolarEdge benefits from that conduct because completed installations, commissioning, and registration enable the intended operation, monitoring, updating, warranty support, and continued use of the Accused Products, expand SolarEdge's installed base, and support SolarEdge's associated products and services.

105. With respect to asserted method claims, to the extent SolarEdge conditions a third-party installer's participation in an activity or receipt of an associated benefit upon the installer's performance of a claimed step and establishes the manner or timing of that performance, Tigo alleges that the installer's performance is attributable to SolarEdge. Tigo separately alleges direct infringement by installers and customers that make, use, or put complete claimed systems into

service and SolarEdge's inducement of those acts. To the extent discovery establishes that SolarEdge directs or controls the use of an entire claimed system, acts through an agent, or contracts for relevant assembly, commissioning, or operational conduct, Tigo pleads those direct-liability theories in the alternative.

**F. SolarEdge Had Actual Notice of the Tigo Patents**

106. SolarEdge had actual notice of Tigo's patent rights, including certain Tigo Patents, before this action was filed. SolarEdge was an active member of the SunSpec Alliance as early as 2010. *See, e.g.*, https://www.tmcnet.com/usubmit/2010/01/06/4560801.htm.

107. SolarEdge continued to be an active member of the SunSpec Alliance through at least 2017. For example, in a SunSpec Member's Briefing dated November 1, 2017, SunSpec acknowledged certain Tigo Patent claims. https://sunspec.org/wp-content/uploads/2019/08/SunSpecRapidShutdownBriefing20171101.pdf. These Tigo patents were listed alongside SolarEdge's patents. *Id*.

108. TE's disclosure of the '172 Patent and '321 Patent, among other patents owned by Tigo, to SunSpec placed SunSpec members, including SolarEdge, on notice of TE's and Tigo's rights in at least the '172 Patent and '321 Patent.

109. Through TE's SunSpec disclosure, SolarEdge had actual knowledge of, or at minimum was willfully blind to, at least the '172 Patent and '321 Patent no later than November 1, 2017.

110. Furthermore, Tigo sent SolarEdge a letter notifying it of the Tigo Patents on January 2, 2026. The letter was addressed to Martin Rogers at SolarEdge Technologies. Ex. 9. On information and belief, the letter, its contents, or analysis or conclusions of the same were sent to or shared with SolarEdge Manufacturing.

111. Additionally, and in the alternative, SolarEdge Manufacturing is imputed with knowledge of SolarEdge Technologies with respect to the Tigo Patents—including the ’172 Patent and ’321 Patent—due to the agency and/or alter-ego relationship between them.

112. SolarEdge’s knowledge of the Tigo Patents—including the ’172 Patent and ’321 Patent—was not incidental or abstract. TE disclosed those patents in the specific technical context of rapid-shutdown communication technology for photovoltaic systems, the same general field in which SolarEdge develops, markets, sells, and supports the Accused Products.

113. Despite this patent-specific notice, SolarEdge continued to make, use, test, demonstrate, sell, offer to sell, import, support, and/or supply the Accused Products without authorization from TE or Tigo.

114. On information and belief, SolarEdge’s continued infringement after acquiring knowledge of the Tigo Patents was deliberate and intentional. SolarEdge knowingly chose to continue its accused activities without modifying the Accused Products to avoid infringement.

115. SolarEdge’s deliberate conduct is further supported by its sophistication in the photovoltaic industry, its familiarity with rapid-shutdown and related photovoltaic-system technologies, and its continued commercialization of the Accused Products after receiving patent-specific notice.

116. SolarEdge has therefore willfully infringed and continues to willfully infringe the Tigo Patents, as further alleged below. Tigo accordingly seeks enhanced damages under 35 U.S.C. § 284 for SolarEdge’s deliberate and intentional infringement, including infringement occurring after SolarEdge acquired actual knowledge of each Tigo Patent.

## JURISDICTION AND VENUE

117. Plaintiff Tigo Energy Innovations LLC is a limited liability company organized and existing under the laws of the State of Texas, with its offices located at 316 W. 12th Street, 4th Floor, Austin, Texas 78701.

118. Defendant SolarEdge Technologies, Inc. is a public corporation organized and existing under the laws of the State of Delaware, with its executive offices located at 700 Tasman Dr., Milpitas, California 95035.

119. Defendant SolarEdge Manufacturing Inc. is a corporation organized and existing under the laws of the State of Delaware, with its executive offices located at 700 Tasman Dr., Milpitas, California 95035. On information and belief, SolarEdge Manufacturing is a wholly-owned subsidiary of SolarEdge Technologies.

120. This Court has original and exclusive jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1338(a).

121. This Court has personal jurisdiction over SolarEdge consistent with the requirements of the Due Process Clause of the United States Constitution and the Texas Long-Arm Statute.

122. SolarEdge has purposefully manufactured and/or directed the manufacture of the Accused Products in this District.

123. SolarEdge Technologies manufactures at least some of the Accused Inverters in Austin, Texas. SolarEdge Technologies and Flex Ltd. ("Flex"—a global manufacturing company) partner to produce these products in a manufacturing facility located in Austin, Texas (the "Austin Facility"). *See* https://investors.solaredge.com/node/14601/pdf. As of June 2, 2025, SolarEdge Technologies had produced 250,000 solar inverters at the Austin Facility. *Id.*

124. SolarEdge Technologies refers to the Austin Facility as "***our*** Austin, Texas manufacturing facility" (emphasis added), and claims to have created more than a thousand jobs in Austin, Texas.

125. In its SEC Form 10-K, SolarEdge Technologies also describes the Austin Facility. It notes "***we*** are manufacturing single phase inverters in Texas". *See* https://www.sec.gov/Archives/edgar/data/1419612/000117891326002201/zk2635126.pdf (emphasis added). SolarEdge Technologies also explains that "some of the automated optimizer assembly lines, our proprietary end-of-line testing equipment and other specific manufacturing equipment utilized in assembling our products or sub-components … are financed and owned by [SolarEdge Technologies]." SolarEdge claims that it employs "a serial number-driven manufacturing process auditing and traceability system that allows us to control production line activities, verify correct manufacturing processes and to achieve item-specific traceability." *Id.*

126. Individuals can schedule tours of the Austin Facility through SolarEdge's website, which refers to the Austin Facility as "***our*** manufacturing facilit[y] in Austin, Texas."

127. Furthermore, upon information and belief, SolarEdge directly employs individuals at the Austin Facility. Job postings indicate that SolarEdge is seeking employees at various positions in "Austin, TX." Several of these postings are for engineering positions. Upon information and belief, the engineering positions relate to the production of SolarEdge's inverters.

128. Indeed, one such position for the role of "ATE Engineer" lists the job functions as being "responsible for overseeing and supporting the production line testing operations at the Flex TX site" in Austin, Texas. https://www.linkedin.com/jobs/view/ate-engineer-at-solaredge-technologies-4373620142/.

129. SolarEdge Technologies, therefore, maintains a physical place of business, the Austin Facility, in this District.

130. Alternatively, and at a minimum, Flex is an agent of SolarEdge Technologies because SolarEdge Technologies gives Flex step by step instructions for manufacturing SolarEdge's products: SolarEdge owns the assembly lines and other equipment used for manufacturing and employs an auditing system for monitoring the manufacture of products at the Austin Facility. *See, e.g.*, https://www.sec.gov/Archives/edgar/data/1419612/000117891326001595/zk2634863.htm. SolarEdge also employs individuals in the Austin Facility to "oversee[] . . . production line testing operations." https://www.linkedin.com/jobs/view/ate-engineer-at-solaredge-technologies-4373620142/. These individuals "[l]ead and mentor a team of engineers and technicians," "[a]llocate tasks," "[s]upervise ATE operations," "[i]mplement strategic initiatives," and "[c]onduct in-depth training." *Id.*

131. Because it is SolarEdge Technologies' agent, Flex's physical place of business, the Austin Facility, is imputed to SolarEdge Technologies.

132. Additionally, SolarEdge has committed acts of infringement in this district. Upon information and belief, SolarEdge manufactures the Accused Products at the Austin Facility.

133. On information and belief, SolarEdge conducts business with and through installers, distributors, electrical-equipment wholesalers, and engineering, procurement, and construction firms that market, sell, install, and support SolarEdge products in this District, including within this Division. SolarEdge publicly acknowledges that it primarily sells its products indirectly to thousands of solar installers through large distributors and electrical-equipment wholesalers and directly to large solar installers and engineering, procurement, and construction firms. SolarEdge further reported that, as of December 31, 2025, more than 93,000 installers worldwide had installed SolarEdge photovoltaic systems, based on the number of installer accounts on SolarEdge's monitoring platform. *See*

https://www.sec.gov/Archives/edgar/data/1419612/000117891326002201/zk2635126.pdf. Installers serving this District sell, install, connect, configure, provision, commission, test, activate, service, and/or support SolarEdge systems, including systems using the Accused Products, for customers in this District.

134. Publicly available information specifically identifies solar installers and installation networks located in or serving Midland and Odessa that offer SolarEdge-branded equipment, including the Accused Products. Yup Solar maintains separate Midland and Odessa installation pages that offer a "SolarEdge Inverter with Panel Optimizers" and describe system design, permitting, installation, activation, monitoring, and warranty services. *See* https://yupsolar.com/solar-installer/texas/midland/midland/; https://yupsolar.com/solar-installer/texas/ector/odessa/. PAIC Solar maintains an office in Midland and is publicly identified as a solar installer that uses SolarEdge inverters. *See* https://paicsolar.com/; https://www.enfsolar.com/paic-solar. TriSMART Solar identifies Midland / Odessa as one of its installation service areas and offers SolarEdge storage solutions designed to integrate with photovoltaic systems. *See* https://www.trismartsolar.com/service-areas/midland/; https://www.trismartsolar.com/battery-storage/. On information and belief, SolarEdge systems using Accused Inverters and Accused Power Optimizers are marketed, offered for sale, sold, installed, commissioned, operated, monitored, and serviced in Midland, Odessa, and elsewhere within this Division. SolarEdge provides installers, customers, and end users in the Division with installation and commissioning tools, monitoring services, firmware and software updates, warranty services, and technical support, and derives revenue and other commercial benefits from the sale, installation, and continuing operation of those systems.

135. SolarEdge Manufacturing is the alter-ego and/or agent of SolarEdge Technologies.

136. On information and belief, SolarEdge Manufacturing is the wholly owned subsidiary of SolarEdge Technologies.

137. On information and belief, and consistent with SolarEdge Technologies' public SEC filings, SolarEdge Technologies acts as a guarantor for SolarEdge Manufacturing, evidencing control over SolarEdge Manufacturing and a lack of capitalization on behalf of SolarEdge Manufacturing.

138. On information and belief, SolarEdge Manufacturing has no physical offices or employees of its own. Its incorporation documents list the same principal address as SolarEdge Technologies.

139. Therefore, venue is appropriate in this District under 28 U.S.C. §§ 1391 and 1400(b) with respect to both defendants.

140. Furthermore, this Court has personal jurisdiction over SolarEdge pursuant to Texas's long-arm statute, which extends to the limits of due process.

141. SolarEdge has purposefully directed activities toward this District, and the exercise of personal jurisdiction is consistent with traditional notions of fair play and substantial justice.

142. As set forth above, SolarEdge has directly and/or through intermediaries made, used, offered for sale, sold, and imported infringing products within this District, including within this Division.

143. As described above, SolarEdge maintains established distribution channels that deliver infringing products into this District.

144. SolarEdge markets and promotes the Accused Products to customers in this District, including through interactive websites, sales representatives, third party installers (such as Longhorn Solar) and promotional activities.

145. Furthermore, SolarEdge maintains ongoing commercial relationships with customers and distributors located in this District.

146. Tigo's claims arise directly from SolarEdge's acts of infringement in this District, including the sale and offer for sale of Accused Products and, on information and belief, SolarEdge's making, using, testing, and demonstration of Accused Products and complete SolarEdge systems in this District.

147. The exercise of personal jurisdiction over SolarEdge is reasonable and does not offend traditional notions of fair play and substantial justice, as SolarEdge has derived substantial benefit from its activities in this District.

## COUNT ONE

## Infringement of the '172 Patent

148. Tigo restates and realleges each of the assertions set forth in the preceding paragraphs.

149. Pursuant to 35 U.S.C. § 282, the claims of the '172 Patent are presumed valid.

150. In view of the foregoing facts and allegations, including paragraphs 77-98 above, SolarEdge has infringed and continues to infringe one or more of the claims of the '172 Patent, including but not limited to exemplary claim 17, pursuant to 35 U.S.C. § 271. SolarEdge directly infringes by using, testing, demonstrating, commissioning, and/or operating installed SolarEdge systems in a manner that practices the claimed methods and by making, assembling, using, testing, demonstrating, commissioning, and/or operating SolarEdge systems. SolarEdge also induces and/or contributes to infringement by others as alleged below.

151. Claim 17 of the '172 Patent recites:

**17.** A method comprising:

monitoring a voltage across a string bus section connecting a solar module to a voltage output; and

limiting the voltage output based on a maximum regulatory safety voltage by limiting a voltage of the solar module.

152. SolarEdge has directly infringed and continues to directly infringe one or more claims of the ’172 Patent in violation of 35 U.S.C. § 271(a). For example, SolarEdge directly infringes by using, testing, demonstrating, commissioning, and/or operating installed SolarEdge systems in a manner that performs the claimed methods, as set forth in paragraphs 77-98 above, which demonstrate infringement of at least claim 17 of the ’172 Patent by showing that:

a. SolarEdge describes the typical system as including “inverters, power optimizers, [and] a communication device.” The string bus carries energy from the solar modules, through the associated Accused Power Optimizers, to the input of the Accused Inverter. During operation, the Accused Inverters monitor voltage across a string bus section, including by monitoring the conductors between an Accused Inverter and Accused Power Optimizers;

b. the Accused Inverters limit the voltage output of Accused Power Optimizers to remain compliant with maximum voltages specified by regulatory safety standards. For example, during rapid shutdown, SolarEdge’s module-level safety architecture causes the Accused Power Optimizers to stop providing normal string voltage and to enter SafeDC mode.

153. Installers, customers, and end users also directly infringe one or more claims of the ’172 Patent. Installers directly infringe the asserted claims by assembling, installing, connecting, configuring, provisioning, commissioning, testing, and/or putting into service complete SolarEdge systems that include the Accused Products and PV modules. Installers, customers, and end users directly infringe by commissioning, activating, testing, putting the complete systems into service, and/or controlling their operation, and obtaining the benefit of the electrical power and related functionality produced by the systems.

154. The foregoing acts of installers and other third parties are attributable to SolarEdge for purposes of direct infringement. SolarEdge directs and controls the manner in which complete SolarEdge systems are installed, connected, configured, provisioned, commissioned, activated, monitored, and operated through the design of the Accused Products, SolarEdge installation manuals and quick-install guides, technical requirements, SetApp, SolarEdge Go, Mapper, Designer, and the SolarEdge monitoring platform, installer training and certification resources, and technical support. SolarEdge benefits from those acts because the resulting installation and commissioning of complete SolarEdge systems enables the intended sale, activation, operation, monitoring, and support of the Accused Products and expands the installed base of SolarEdge products and services. Accordingly, to the extent necessary, SolarEdge is responsible for those acts under principles of direction and control, agency, and/or vicarious liability, including with respect to the making and use of complete systems and the use and performance of the claimed inventions.

155. SolarEdge has had notice of and has been aware of the ’172 Patent since at least November 1, 2017, by virtue of SolarEdge’s active participation with SunSpec.

156. By continuing to make, use, sell, offer to sell, and/or import the Accused Products after SolarEdge first had notice of the ’172 Patent, SolarEdge indirectly infringes and continues to indirectly infringe by active inducement one or more claims of the ’172 Patent, including but not limited to exemplary claim 17, pursuant to 35 U.S.C. § 271(b). SolarEdge has done so by acts including but not limited to (1) selling, offering for sale, or importing the Accused Products which, when used as marketed and intended by SolarEdge, infringe the ’172 Patent either literally or under the doctrine of equivalents; (2) marketing the infringing capabilities of the Accused Products; and (3) providing instructions, technical support, and other support and encouragement for the infringing use of the Accused Products. SolarEdge has performed and continues to perform these

affirmative acts with knowledge of the ’172 Patent and with the intent, or willful blindness, that the induced acts directly infringe the ’172 Patent.

157. By continuing to make, use, sell, offer to sell, and/or import the Accused Products after SolarEdge first had notice of the ’172 Patent, SolarEdge indirectly infringes and continues to indirectly infringe by contributing to the infringement of one or more claims of the ’172 Patent, including but not limited to exemplary claim 17, pursuant to 35 U.S.C. § 271(c). SolarEdge's affirmative acts of manufacturing, selling, offering for sale, and/or importing the Accused Products, in this District and elsewhere in the United States, contribute to SolarEdge’s customers and end-users directly infringing the ’172 Patent with the Accused Products. The Accused Products are not a staple article or commodity of commerce, have no substantial non-infringing uses, and are known by SolarEdge to be especially made and/or especially adapted for use in infringement of the ’172 Patent. SolarEdge has performed and continues to perform these affirmative acts with knowledge of the ’172 Patent and with the intent, or willful blindness, that they cause the direct infringement of the ’172 Patent.

158. Tigo has suffered and continues to suffer damages as a result of SolarEdge’s infringement of the ’172 Patent in an amount to be determined at trial.

159. Tigo has suffered and will continue to suffer irreparable harm unless SolarEdge’s infringement is enjoined by this Court. Tigo is entitled to all remedies available under the patent laws, including damages adequate to compensate for SolarEdge’s infringement, enhanced damages for willful infringement, pre- and post-judgment interest, costs, and, where appropriate, injunctive relief under 35 U.S.C. § 283.

## COUNT TWO

### Infringement of the ’241 Patent

160. Tigo restates and realleges each of the assertions set forth in the preceding paragraphs.

161. Pursuant to 35 U.S.C. § 282, the claims of the ’241 Patent are presumed valid.

162. In view of the foregoing facts and allegations, including paragraphs 77-98 above, SolarEdge has infringed and continues to infringe one or more of the claims of the ’241 Patent, including but not limited to exemplary claim 1, pursuant to 35 U.S.C. § 271. SolarEdge directly infringes by making, assembling, using, testing, demonstrating, commissioning, and/or operating SolarEdge systems. SolarEdge also induces and/or contributes to infringement by supplying Accused Products for incorporation into and use in infringing apparatuses as alleged below.

163. Claim 1 of the ’241 Patent recites:

> **1.** An apparatus, comprising:
>
> a photovoltaic energy production unit to generate electricity; and
>
> a local management unit, coupled between the photovoltaic energy production unit and a connection of energy production units forming a string bus, the local management unit having:
>
> > a controller,
> >
> > a voltage converter having switching circuitry, and
> >
> > a communication transmission modulator;
>
> wherein the controller provides a control for the switching circuitry to cause the voltage converter to deliver electrical energy generated by the photovoltaic energy production unit to the string bus; and
>
> wherein the communication transmission modulator modulates the control, provided by the controller to the switching circuitry of the voltage converter, with data to be transmitted from the local management unit over the string bus.

164. SolarEdge has directly infringed and continues to directly infringe at least claim 1 of the ’241 Patent in violation of 35 U.S.C. § 271(a). SolarEdge directly infringes by making,

assembling, using, testing, demonstrating, commissioning, and/or operating SolarEdge systems. On information and belief, SolarEdge undertakes such activities at least through research, development, validation, testing, demonstrations, installer training, commissioning, technical support, and troubleshooting involving complete systems.

165. SolarEdge's infringement of the '241 Patent is shown by way of exemplary systems, as set forth in paragraphs 77-98 above, which demonstrate infringement of at least claim 1 of the '241 Patent by showing that:

a. the Accused Power Optimizers are apparatuses for converting the voltage of a PV module to a regulated DC output voltage;

b. each Accused Power Optimizers is used with a PV panel that generates electricity;

c. the Accused Power Optimizers are local management units and are coupled between solar panels and a string bus;

d. a plurality of Accused Power Optimizers, and their respective PV panels, are connected in series to form a string bus;

e. the Accused Power Optimizers include controllers, including a SolarEdge LV640453PA microcontroller;

f. the Accused Power Optimizers include a buck/boost converter having switching circuitry in the form of MOSFETs;

g. the Accused Power Optimizers include a transmission modulator with a controller and voltage converter for power line communications (the PLC circuitry);

h. the controller in the Accused Power Optimizers send controls signals to gate drivers, such as LM5101 gate drivers, which "drive[] both a high side and a low side n-channel MOSFET," to cause the buck/boost converter to deliver electrical energy generated by the PV panel to the string bus; and

i. the PLC circuitry modulates the control signal provided by the microcontroller to the switching circuitry of the buck/boost converter, with data to be transmitted to Accused Power Optimizers over the string bus.

166. Installers, customers, and end users also directly infringe one or more claims of the ’241 Patent. Installers directly infringe the asserted claims by assembling, installing, connecting, configuring, provisioning, commissioning, testing, and/or putting into service complete SolarEdge systems that include the Accused Products and PV modules. Installers, customers, and end users directly infringe by commissioning, activating, testing, putting the complete systems into service, and/or controlling their operation, and obtaining the benefit of the electrical power and related functionality produced by the systems.

167. The foregoing acts of installers and other third parties are attributable to SolarEdge for purposes of direct infringement. SolarEdge directs and controls the manner in which complete SolarEdge systems are installed, connected, configured, provisioned, commissioned, activated, monitored, and operated through the design of the Accused Products, SolarEdge installation manuals and quick-install guides, technical requirements, SetApp, SolarEdge Go, Mapper, Designer, and the SolarEdge monitoring platform, installer training and certification resources, and technical support. SolarEdge benefits from those acts because the resulting installation and commissioning of complete SolarEdge systems enables the intended sale, activation, operation, monitoring, and support of the Accused Products and expands the installed base of SolarEdge products and services. Accordingly, to the extent necessary, SolarEdge is responsible for those acts under principles of direction and control, agency, and/or vicarious liability, including with respect to the making and use of complete systems and the use and performance of the claimed inventions.

168. SolarEdge has had notice of and has been aware of the ’241 Patent since at least January 2, 2026, when Tigo sent a letter to SolarEdge Technologies notifying it of Tigo’s portfolio of patents. Ex. 9.

169. By continuing to make, use, sell, offer to sell, and/or import the Accused Products after SolarEdge first had notice of the ’241 Patent, SolarEdge indirectly infringes and continues to indirectly infringe by active inducement one or more claims of the ’241 Patent, including but not limited to exemplary claim 1, pursuant to 35 U.S.C. § 271(b). SolarEdge has done so by acts including but not limited to (1) selling, offering for sale, or importing the Accused Products which, when used as marketed and intended by SolarEdge, infringe the ’241 Patent either literally or under the doctrine of equivalents; (2) marketing the infringing capabilities of the Accused Products; and (3) providing instructions, technical support, and other support and encouragement for the infringing use of the Accused Products. SolarEdge has performed and continues to perform these affirmative acts with knowledge of the ’241 Patent and with the intent, or willful blindness, that the induced acts directly infringe the ’241 Patent.

170. By continuing to make, use, sell, offer to sell, and/or import the Accused Products after SolarEdge first had notice of the ’241 Patent, SolarEdge indirectly infringes and continues to indirectly infringe by contributing to the infringement of one or more claims of the ’241 Patent, including but not limited to exemplary claim 1, pursuant to 35 U.S.C. § 271(c). SolarEdge’s affirmative acts of manufacturing, selling, offering for sale, and/or importing the Accused Products, in this District and elsewhere in the United States, contribute to SolarEdge’s customers and end-users directly infringing the ’241 Patent with the Accused Products. The Accused Products are not a staple article or commodity of commerce, have no substantial non-infringing uses, and are known by SolarEdge to be especially made and/or especially adapted for use in infringement of the ’241 Patent. SolarEdge has performed and continues to perform these

affirmative acts with knowledge of the ’241 Patent and with the intent, or willful blindness, that they cause the direct infringement of the ’241 Patent.

171. Tigo has suffered and continues to suffer damages as a result of SolarEdge’s infringement of the ’241 Patent in an amount to be determined at trial.

172. Tigo has suffered and will continue to suffer irreparable harm unless SolarEdge’s infringement is enjoined by this Court. Tigo is entitled to all remedies available under the patent laws, including damages adequate to compensate for SolarEdge’s infringement, enhanced damages for willful infringement, pre- and post-judgment interest, costs, and, where appropriate, injunctive relief under 35 U.S.C. § 283.

**COUNT THREE**

**Infringement of the ’321 Patent**

173. Tigo restates and realleges each of the assertions set forth in the preceding paragraphs.

174. Pursuant to 35 U.S.C. § 282, the claims of the ’321 Patent are presumed valid.

175. In view of the foregoing facts and allegations, including paragraphs 77-98 above, SolarEdge has infringed and continues to infringe one or more of the claims of the ’321 Patent, including but not limited to exemplary claim 1, pursuant to 35 U.S.C. § 271. SolarEdge directly infringes by making, assembling, using, testing, demonstrating, commissioning, and/or operating SolarEdge systems. SolarEdge also induces and/or contributes to infringement by supplying Accused Products for incorporation into and use in infringing apparatuses as alleged below.

176. Claim 1 of the ’321 Patent recites:

> **1.** A system, comprising:
>
> a watchdog unit coupled between a solar module and a power bus, the power bus configured to connect a plurality of solar modules to an inverter,
>
> the watchdog unit having: a local controller configured to monitor a communication from a central controller remote from the solar module and determine whether the

communication has been interrupted for a time period longer than a predetermined number of allowed skips; and

at least one switch configured to disconnect the solar module from the power bus in response to a determination by the location controller that the communication from the central controller has been interrupted for a time period longer than the predetermined number of allowed skips;

wherein the watchdog unit is configured to connect the solar module to the power bus when the communication is not interrupted.

177. SolarEdge's has directly infringed and continues to directly infringe at least claim 1 of the '321 Patent in violation of 35 U.S.C. § 271(a). SolarEdge directly infringes by making, assembling, using, testing, demonstrating, commissioning, and/or operating SolarEdge systems. On information and belief, SolarEdge undertakes such activities at least through research, development, validation, testing, demonstrations, installer training, commissioning, technical support, and troubleshooting involving complete systems.

178. SolarEdge's infringement of the '321 Patent is shown by way of exemplary systems, as set forth in paragraphs 77-98 above, which demonstrate infringement of at least claim 1 of the '321 Patent by showing that:

a. the Accused Power Optimizers are watchdog units and advertised by SolarEdge as having connectors that allow them to be coupled between a solar module (PV panel) and a power bus. SolarEdge's technical documents show that the power bus of the system is configured to connect a plurality of solar modules to an Accused Inverter;

b. the Accused Inverters are central controllers. For instance, the SolarEdge system can comprise power optimizers located with PV panels on the roof of a home, with an inverter located remotely from the power optimizers;

c. the Accused Power Optimizers are local controllers that monitor communications from an Accused Inverter via a microcontroller. SolarEdge's technical documents also emphasize panel-level optimization/MPPT and module-level monitoring in the

Accused Power Optimizers;

d. the Accused Power Optimizers shut down after a period of time in which they do not detect any communication from the Accused Inverter. For instance, they can enter SafeDC Mode and revert to a default voltage of 1V per module "[w]hen there is no communication between the inverter and power optimizer";

e. the Accused Power Optimizers are configured to connect the solar module to the power bus when the communications are not interrupted. For example, the Accused Power Optimizers output power to the power bus when a powerline communication is present.

179. Installers, customers, and end users also directly infringe one or more claims of the '321 Patent. Installers directly infringe the asserted claims by assembling, installing, connecting, configuring, provisioning, commissioning, testing, and/or putting into service complete SolarEdge systems that include the Accused Products and PV modules. Installers, customers, and end users directly infringe by commissioning, activating, testing, putting the complete systems into service, and/or controlling their operation, and obtaining the benefit of the electrical power and related functionality produced by the systems.

180. The foregoing acts of installers and other third parties are attributable to SolarEdge for purposes of direct infringement. SolarEdge directs and controls the manner in which complete SolarEdge systems are installed, connected, configured, provisioned, commissioned, activated, monitored, and operated through the design of the Accused Products, SolarEdge installation manuals and quick-install guides, technical requirements, SetApp, SolarEdge Go, Mapper, Designer, and the SolarEdge monitoring platform, installer training and certification resources, and technical support. SolarEdge benefits from those acts because the resulting installation and commissioning of complete SolarEdge systems enables the intended sale, activation, operation, monitoring, and support of the Accused Products and expands the installed base of SolarEdge

products and services. Accordingly, to the extent necessary, SolarEdge is responsible for those acts under principles of direction and control, agency, and/or vicarious liability, including with respect to the making and use of complete systems and the use and performance of the claimed inventions.

181. SolarEdge has had notice of and has been aware of the ’321 Patent since at least November 1, 2017, by virtue of SolarEdge’s active participation with SunSpec.

182. By continuing to make, use, sell, offer to sell, and/or import the Accused Products after SolarEdge first had notice of the ’321 Patent, SolarEdge indirectly infringes and continues to indirectly infringe by active inducement one or more claims of the ’321 Patent, including but not limited to exemplary claim 1, pursuant to 35 U.S.C. § 271(b). SolarEdge has done so by acts including but not limited to (1) selling, offering for sale, or importing the Accused Products which, when used as marketed and intended by SolarEdge, infringe the ’321 Patent either literally or under the doctrine of equivalents; (2) marketing the infringing capabilities of the Accused Products; and (3) providing instructions, technical support, and other support and encouragement for the infringing use of the Accused Products. SolarEdge has performed and continues to perform these affirmative acts with knowledge of the ’321 Patent and with the intent, or willful blindness, that the induced acts directly infringe the ’321 Patent.

183. By continuing to make, use, sell, offer to sell, and/or import the Accused Products after SolarEdge first had notice of the ’321 Patent, SolarEdge indirectly infringes and continues to indirectly infringe by contributing to the infringement of one or more claims of the ’321 Patent, including but not limited to exemplary claim 1, pursuant to 35 U.S.C. § 271(c). SolarEdge’s affirmative acts of manufacturing, selling, offering for sale, and/or importing the Accused Products, in this District and elsewhere in the United States, contribute to SolarEdge’s customers and end-users directly infringing the ’321 Patent with the Accused Products. The Accused

Products are not a staple article or commodity of commerce, have no substantial non-infringing uses, and are known by SolarEdge to be especially made and/or especially adapted for use in infringement of the ’321 Patent. SolarEdge has performed and continues to perform these affirmative acts with knowledge of the ’321 Patent and with the intent, or willful blindness, that they cause the direct infringement of the ’321 Patent.

184. Tigo has suffered and continues to suffer damages as a result of SolarEdge’s infringement of the ’321 Patent in an amount to be determined at trial.

185. Tigo has suffered and will continue to suffer irreparable harm unless SolarEdge’s infringement is enjoined by this Court. Tigo is entitled to all remedies available under the patent laws, including damages adequate to compensate for SolarEdge’s infringement, enhanced damages for willful infringement, pre- and post-judgment interest, costs, and, where appropriate, injunctive relief under 35 U.S.C. § 283.

**COUNT FOUR**

**Infringement of the ’021 Patent**

186. Tigo restates and realleges each of the assertions set forth in the preceding paragraphs.

187. Pursuant to 35 U.S.C. § 282, the claims of the ’021 Patent are presumed valid.

188. In view of the foregoing facts and allegations, including paragraphs 77-98 above, SolarEdge has infringed and continues to infringe one or more of the claims of the ’021 Patent, including but not limited to exemplary claim 1, pursuant to 35 U.S.C. § 271. SolarEdge directly infringes by making, assembling, using, testing, demonstrating, commissioning, and/or operating SolarEdge systems. SolarEdge also induces and/or contributes to infringement by supplying Accused Products for incorporation into and use in infringing apparatuses as alleged below.

189. Claim 1 of the ’021 Patent recites:

**1.** An apparatus, comprising:

a photovoltaic panel configured to generate electric power; and

a local management unit coupled to the photovoltaic panel to receive the electric power as an input and generate a power output from the input;

wherein the local management unit is configured to communicate with a master control unit disposed at a location remote to the local management unit;

wherein a sensor is monitored for an anomaly; and

wherein in response to a determination that the sensor has detected the anomaly, and in response to a determination that the anomaly requires a control change, the local management unit shuts down the power output based on a communication with the master control unit;

wherein the local management unit is configured to receive heartbeat signals from the master control unit; and the local management unit shuts down the power output in response to a predetermined number of skips of the heartbeat signals.

190. SolarEdge has directly infringed and continues to directly infringe at least claim 1 of the ’021 Patent in violation of 35 U.S.C. § 271(a). SolarEdge directly infringes by making, assembling, using, testing, demonstrating, commissioning, and/or operating SolarEdge systems. On information and belief, SolarEdge undertakes such activities at least through research, development, validation, testing, demonstrations, installer training, commissioning, technical support, and troubleshooting involving complete systems.

191. SolarEdge’s infringement of the ’021 Patent is shown by way of exemplary systems, as set forth in paragraphs 77-98 above, which demonstrate infringement of at least claim 1 of the ’021 Patent by showing that:

a. the Accused Power Optimizers and Inverters are configured to be installed with PV panels, as stated by SolarEdge;

b. the Accused Power Optimizers are local management units that couple to PV panels, receive electrical power as an input from the panels, and generate a power output to the string bus;

c. the Accused Inverters are master control units that communicate with the Accused Power Optimizers via powerline communication. SolarEdge technical documents indicate that power optimizers and PV panels can be located on the roof of a home while the inverter is located inside the home;

d. the Accused Power Optimizers have a sensor that detects anomalies as part of the logic controller of their microcontrollers, which monitors for loss of communication between the Accused Inverter and Power Optimizer(s);

e. when there is a loss of communication between an Accused Inverter and Power Optimizers, the Accused Power Optimizers respond to these communications from the Accused Inverter by determining when the power must be reduced and reducing the power optimizer's output. For example, SolarEdge's module-level safety architecture causes the Accused Power Optimizers to stop providing normal string voltage and to enter SafeDC mode; and

f. the Accused Power Optimizers are configured to receive communications from the Accused Inverter via powerline communication and will shut down their output in response when the communication is not present after a period of time.

192. Installers, customers, and end users also directly infringe one or more claims of the '021 Patent. Installers directly infringe the asserted claims by assembling, installing, connecting, configuring, provisioning, commissioning, testing, and/or putting into service complete SolarEdge systems that include the Accused Products and PV modules. Installers, customers, and end users directly infringe by commissioning, activating, testing, putting the complete systems into service, and/or controlling their operation, and obtaining the benefit of the electrical power and related functionality produced by the systems.

193. The foregoing acts of installers and other third parties are attributable to SolarEdge for purposes of direct infringement. SolarEdge directs and controls the manner in which complete SolarEdge systems are installed, connected, configured, provisioned, commissioned, activated, monitored, and operated through the design of the Accused Products, SolarEdge installation manuals and quick-install guides, technical requirements, SetApp, SolarEdge Go, Mapper, Designer, and the SolarEdge monitoring platform, installer training and certification resources, and technical support. SolarEdge benefits from those acts because the resulting installation and commissioning of complete SolarEdge systems enables the intended sale, activation, operation, monitoring, and support of the Accused Products and expands the installed base of SolarEdge products and services. Accordingly, to the extent necessary, SolarEdge is responsible for those acts under principles of direction and control, agency, and/or vicarious liability, including with respect to the making and use of complete systems and the use and performance of the claimed inventions.

194. SolarEdge has had notice of and has been aware of the ’021 Patent since at least January 2, 2026, when Tigo sent a letter to SolarEdge Technologies notifying it of Tigo’s portfolio of patents. Ex. 9.

195. By continuing to make, use, sell, offer to sell, and/or import the Accused Products after SolarEdge first had notice of the ’021 Patent, SolarEdge indirectly infringes and continues to indirectly infringe by active inducement one or more claims of the ’021 Patent, including but not limited to exemplary claim 1, pursuant to 35 U.S.C. § 271(b). SolarEdge has done so by acts including but not limited to (1) selling, offering for sale, or importing the Accused Products which, when used as marketed and intended by SolarEdge, infringe the ’021 Patent either literally or under the doctrine of equivalents; (2) marketing the infringing capabilities of the Accused Products; and (3) providing instructions, technical support, and other support and encouragement for the

infringing use of the Accused Products. SolarEdge has performed and continues to perform these affirmative acts with knowledge of the ’021 Patent and with the intent, or willful blindness, that the induced acts directly infringe the ’021 Patent.

196. By continuing to make, use, sell, offer to sell, and/or import the Accused Products after SolarEdge first had notice of the ’021 Patent, SolarEdge indirectly infringes and continues to indirectly infringe by contributing to the infringement of one or more claims of the ’021 Patent, including but not limited to exemplary claim 1, pursuant to 35 U.S.C. § 271(c). SolarEdge’s affirmative acts of manufacturing, selling, offering for sale, and/or importing the Accused Products, in this District and elsewhere in the United States, contribute to SolarEdge’s customers and end-users directly infringing the ’021 Patent with the Accused Products. The Accused Products are not a staple article or commodity of commerce, have no substantial non-infringing uses, and are known by SolarEdge to be especially made and/or especially adapted for use in infringement of the ’021 Patent. SolarEdge has performed and continues to perform these affirmative acts with knowledge of the ’021 Patent and with the intent, or willful blindness, that they cause the direct infringement of the ’021 Patent.

197. Tigo has suffered and continues to suffer damages as a result of SolarEdge’s infringement of the ’021 Patent in an amount to be determined at trial.

198. Tigo has suffered and will continue to suffer irreparable harm unless SolarEdge’s infringement is enjoined by this Court. Tigo is entitled to all remedies available under the patent laws, including damages adequate to compensate for SolarEdge’s infringement, enhanced damages for willful infringement, pre- and post-judgment interest, costs, and, where appropriate, injunctive relief under 35 U.S.C. § 283.

## COUNT FIVE

### Infringement of the ’385 Patent

199. Tigo restates and realleges each of the assertions set forth in the preceding paragraphs.

200. Pursuant to 35 U.S.C. § 282, the claims of the ’385 Patent are presumed valid.

201. In view of the foregoing facts and allegations, including paragraphs 77-98 above, SolarEdge has infringed and continues to infringe one or more of the claims of the ’385 Patent, including but not limited to exemplary claim 10, pursuant to 35 U.S.C. § 271. SolarEdge infringes by, without authority, making, using, testing, demonstrating, selling, offering to sell, and/or importing the Accused Products, including the Accused Power Optimizers. SolarEdge also induces and/or contributes to infringement by others.

202. Claim 10 of the ’385 Patent recites:

> **10**. A non-transitory computer-readable storage medium storing thereon computer readable instructions configured to instruct a local management unit of a solar module to perform a method, the method comprising:
>
> sending a first identification code from a first local management unit to a master management unit, the first identification code associated with the first local management unit, and the first local management unit coupled to control the solar module;
>
> receiving, from the master management unit, an authentication of the first identification code;
>
> in response to receiving the authentication of the first identification code, continuing active operation of the first local management unit;
>
> establishing communication with the master management unit from a second local management unit of a plurality of local management units including the first local management unit;
>
> communicating to the master management unit a second identification code associated with the second local management unit;
>
> receiving, from the master management unit, an authentication of the second identification code; and

> in response to receiving the authentication of the second identification code, continuing active operation of the second local management unit.

203. SolarEdge has directly infringed and continues to directly infringe at least claim 10 of the ’385 Patent in violation of 35 U.S.C. § 271(a). SolarEdge directly infringes by making, using, testing, demonstrating, selling, offering to sell, and/or importing the Accused Products, including the Accused Power Optimizers.

204. SolarEdge’s infringement of the ’385 Patent is shown by way of exemplary systems, as set forth in paragraphs 77-98 above, which demonstrate infringement of at least claim 10 of the ’385 Patent by showing that:

a. the Accused Power Optimizers are local management units that each couple to a PV panel and contain computer readable instructions configured to instruct the Accused Power Optimizers to perform a method;

b. the Accused Inverters are master management units that are connected to Accused Power Optimizers on a power bus;

c. an Accused Inverter can be paired to one or more Accused Power Optimizers, which involves each power optimizer “reporting in” to the Accused Inverter with an identification code for the Power Optimizer. SolarEdge technical documents describe connecting an Accused Inverter to multiple Accused Power Optimizers;

d. the pairing process further involves using the SetApp application to commission and activate the system and the Accused Inverter authenticating the identification code of each Accused Power Optimizer. SolarEdge technical documents confirm that during the “activation and commission” of the Accused Inverters and Power Optimizers, “the inverter discovers and communicates with all connected components in the solar

system," including power optimizers;

e. each Accused Power Optimizer receives an authentication code after pairing to the Accused Inverter; and

f. each Accused Power Optimizer continues to operate in response to receiving an authentication code from the Accused Inverter.

205. Installers, customers, and end users also directly infringe one or more claims of the '385 Patent. Installers directly infringe the asserted claims by assembling, installing, connecting, configuring, provisioning, commissioning, testing, and/or putting into service complete SolarEdge systems that include the Accused Products and PV modules. Installers, customers, and end users directly infringe by commissioning, activating, testing, putting the complete systems into service, and/or controlling their operation, and obtaining the benefit of the electrical power and related functionality produced by the systems.

206. The foregoing acts of installers and other third parties are attributable to SolarEdge for purposes of direct infringement. SolarEdge directs and controls the manner in which complete SolarEdge systems are installed, connected, configured, provisioned, commissioned, activated, monitored, and operated through the design of the Accused Products, SolarEdge installation manuals and quick-install guides, technical requirements, SetApp, SolarEdge Go, Mapper, Designer, and the SolarEdge monitoring platform, installer training and certification resources, and technical support. SolarEdge benefits from those acts because the resulting installation and commissioning of complete SolarEdge systems enables the intended sale, activation, operation, monitoring, and support of the Accused Products and expands the installed base of SolarEdge products and services. Accordingly, to the extent necessary, SolarEdge is responsible for those acts under principles of direction and control, agency, and/or vicarious liability, including with

respect to the making and use of complete systems and the use and performance of the claimed inventions.

207. SolarEdge has had notice of and has been aware of the ’385 Patent since at least January 2, 2026, when Tigo sent a letter to SolarEdge Technologies notifying it of Tigo’s portfolio of patents. Ex. 9.

208. By continuing to make, use, sell, offer to sell, and/or import the Accused Products after SolarEdge first had notice of the ’385 Patent, SolarEdge indirectly infringes and continues to indirectly infringe by active inducement one or more claims of the ’385 Patent, including but not limited to exemplary claim 10, pursuant to 35 U.S.C. § 271(b). SolarEdge has done so by acts including but not limited to (1) selling, offering for sale, or importing the Accused Products which, when used as marketed and intended by SolarEdge, infringe the ’385 Patent either literally or under the doctrine of equivalents; (2) marketing the infringing capabilities of the Accused Products; and (3) providing instructions, technical support, and other support and encouragement for the infringing use of the Accused Products. SolarEdge has performed and continues to perform these affirmative acts with knowledge of the ’385 Patent and with the intent, or willful blindness, that the induced acts directly infringe the ’385 Patent.

209. By continuing to make, use, sell, offer to sell, and/or import the Accused Products after SolarEdge first had notice of the ’385 Patent, SolarEdge indirectly infringes and continues to indirectly infringe by contributing to the infringement of one or more claims of the ’385 Patent, including but not limited to exemplary claim 10, pursuant to 35 U.S.C. § 271(c). SolarEdge’s affirmative acts of manufacturing, selling, offering for sale, and/or importing the Accused Products, in this District and elsewhere in the United States, contribute to SolarEdge’s customers and end-users directly infringing the ’385 Patent with the Accused Products. The Accused Products are not a staple article or commodity of commerce, have no substantial non-infringing

uses, and are known by SolarEdge to be especially made and/or especially adapted for use in infringement of the ’385 Patent. SolarEdge has performed and continues to perform these affirmative acts with knowledge of the ’385 Patent and with the intent, or willful blindness, that they cause the direct infringement of the ’385 Patent.

210. Tigo has suffered and continues to suffer damages as a result of SolarEdge’s infringement of the ’385 Patent in an amount to be determined at trial.

211. Tigo has suffered and will continue to suffer irreparable harm unless SolarEdge’s infringement is enjoined by this Court. Tigo is entitled to all remedies available under the patent laws, including damages adequate to compensate for SolarEdge’s infringement, enhanced damages for willful infringement, pre- and post-judgment interest, costs, and, where appropriate, injunctive relief under 35 U.S.C. § 283.

**COUNT SIX**

**Infringement of the ’770 Patent**

212. Tigo restates and realleges each of the assertions set forth in the preceding paragraphs.

213. Pursuant to 35 U.S.C. § 282, the claims of the ’770 Patent are presumed valid.

214. In view of the foregoing facts and allegations, including paragraphs 77-98 above, SolarEdge has infringed and continues to infringe one or more of the claims of the ’770 Patent, including but not limited to exemplary claim 1, pursuant to 35 U.S.C. § 271. SolarEdge directly infringes by making, assembling, using, testing, demonstrating, commissioning, and/or operating SolarEdge systems. SolarEdge also induces and/or contributes to infringement by supplying Accused Products for incorporation into and use in infringing apparatuses as alleged below.

215. Claim 1 of the ’770 Patent is recited below:

1. A photovoltaic panel, comprising:

at least one photovoltaic cell;

a local unit configured on the photovoltaic panel, the local unit having:

a voltage regulator coupled to the at least one photovoltaic cell to receive electric power generated by the at least one photovoltaic cell; and

a controller coupled to the voltage regulator;

wherein the voltage regulator provides a power output of the photovoltaic panel using the electric power generated by the at least one photovoltaic cell;

wherein the controller communicates with a remote unit, disposed at a location remote from the local unit, to control operations of the voltage regulator;

wherein a sensor is monitored for an anomaly; and

wherein in response to a determination that the sensor has detected the anomaly, the controller causes the voltage regulator to shut down the power output of the photovoltaic panel based on a communication with the remote unit.

216. SolarEdge has directly infringed and continues to directly infringe at least claim 1 of the ’770 Patent in violation of 35 U.S.C. § 271(a). SolarEdge directly infringes by making, assembling, using, testing, demonstrating, commissioning, and/or operating SolarEdge systems. On information and belief, SolarEdge undertakes such activities at least through research, development, validation, testing, demonstrations, installer training, commissioning, technical support, and troubleshooting involving complete systems.

217. SolarEdge’s infringement of the ’770 Patent is shown by way of exemplary systems, as set forth in paragraphs 77-98 above, which demonstrate infringement of at least claim 1 of the ’770 Patent by showing that:

a. the Accused Products are intended to, and are installed to, interact with a PV panel, as stated by SolarEdge;

b. photovoltaic panels comprise a plurality of PV cells;

c. the Accused Power Optimizers are local units connected to or embedded into PV Panels, as shown in SolarEdge technical documents;

d. the Accused Power Optimizers include a buck/boost converter coupled to the PV cell that receives the power generated by the cell. The buck/boost converter regulates PV output voltage;

e. the Accused Power Optimizers have a microcontroller coupled to the buck/boost converter;

f. the buck/boost converter provides a power output of the PV panels to which the Accused Power Optimizer comprising the buck/boost converter is connected;

g. the microcontroller of the Accused Power Optimizer communicates with an Accused Inverter, which is located remotely, to control operations of the Accused Power Optimizer's buck/boost converter. For example, the Accused Inverter can modify the operation of each Accused Power Optimizer by using a constant control loop to maintain a fixed DC string voltage;

h. the Accused Power Optimizer and/or Inverter has a sensor that detects anomalies as part of the logic control of the microcontroller; and

i. the SafeDC system allows the Accused Power Optimizers to be shut down when there is an arc detection, a loss, or change of communication with the Accused Inverter.

218. Installers, customers, and end users also directly infringe one or more claims of the '770 Patent. Installers directly infringe the asserted claims by assembling, installing, connecting, configuring, provisioning, commissioning, testing, and/or putting into service complete SolarEdge systems that include the Accused Products and PV modules. Installers, customers, and end users directly infringe by commissioning, activating, testing, putting the complete systems into service, and/or controlling their operation, and obtaining the benefit of the electrical power and related functionality produced by the systems.

219. The foregoing acts of installers and other third parties are attributable to SolarEdge for purposes of direct infringement. SolarEdge directs and controls the manner in which complete SolarEdge systems are installed, connected, configured, provisioned, commissioned, activated, monitored, and operated through the design of the Accused Products, SolarEdge installation manuals and quick-install guides, technical requirements, SetApp, SolarEdge Go, Mapper, Designer, and the SolarEdge monitoring platform, installer training and certification resources, and technical support. SolarEdge benefits from those acts because the resulting installation and commissioning of complete SolarEdge systems enables the intended sale, activation, operation, monitoring, and support of the Accused Products and expands the installed base of SolarEdge products and services. Accordingly, to the extent necessary, SolarEdge is responsible for those acts under principles of direction and control, agency, and/or vicarious liability, including with respect to the making and use of complete systems and the use and performance of the claimed inventions.

220. SolarEdge has had notice of and has been aware of the ’770 Patent since at least January 2, 2026, when Tigo sent a letter to SolarEdge Technologies notifying it of Tigo’s portfolio of patents. Ex. 9.

221. By continuing to make, use, sell, offer to sell, and/or import the Accused Products after SolarEdge first had notice of the ’770 Patent, SolarEdge indirectly infringes and continues to indirectly infringe by active inducement one or more claims of the ’770 Patent, including but not limited to exemplary claim 1, pursuant to 35 U.S.C. § 271(b). SolarEdge has done so by acts including but not limited to (1) selling, offering for sale, or importing the Accused Power Optimizers which, when used as marketed and intended by SolarEdge, infringe the ’770 Patent either literally or under the doctrine of equivalents; (2) marketing the infringing capabilities of the Accused Power Optimizers; and (3) providing instructions, technical support, and other support

and encouragement for the infringing use of the Accused Power Optimizers. SolarEdge has performed and continues to perform these affirmative acts with knowledge of the ’770 Patent and with the intent, or willful blindness, that the induced acts directly infringe the ’770 Patent.

222. By continuing to make, use, sell, offer to sell, and/or import the Accused Products after SolarEdge first had notice of the ’770 Patent, SolarEdge indirectly infringes and continues to indirectly infringe by contributing to the infringement of one or more claims of the ’770 Patent, including but not limited to exemplary claim 1, pursuant to 35 U.S.C. § 271. SolarEdge’s affirmative acts of manufacturing, selling, offering for sale, and/or importing the Accused Products, in this District and elsewhere in the United States, contribute to SolarEdge’s customers and end-users directly infringing the ’770 Patent with the Accused Products. The Accused Products are not a staple article or commodity of commerce, have no substantial non-infringing uses, and are known by SolarEdge to be especially made and/or especially adapted for use in infringement of the ’770 Patent. SolarEdge has performed and continues to perform these affirmative acts with knowledge of the ’770 Patent and with the intent, or willful blindness, that they cause the direct infringement of the ’770 Patent.

223. Tigo has suffered and continues to suffer damages as a result of SolarEdge’s infringement of the ’770 Patent in an amount to be determined at trial.

224. Tigo has suffered and will continue to suffer irreparable harm unless SolarEdge’s infringement is enjoined by this Court. Tigo is entitled to all remedies available under the patent laws, including damages adequate to compensate for SolarEdge’s infringement, enhanced damages for willful infringement, pre- and post-judgment interest, costs, and, where appropriate, injunctive relief under 35 U.S.C. § 283.

**COUNT SEVEN**

**Infringement of the ’403 Patent**

225. Tigo restates and realleges each of the assertions set forth in the preceding paragraphs.

226. Pursuant to 35 U.S.C. § 282, the claims of the ’403 Patent are presumed valid.

227. In view of the foregoing facts and allegations, including paragraphs 77-98 above, SolarEdge has infringed and continues to infringe one or more of the claims of the ’403 Patent, including but not limited to exemplary claim 10 pursuant to 35 U.S.C. § 271. SolarEdge directly infringes by, without authority, making, using, testing, demonstrating, selling, offering to sell, and/or importing the Accused Products. SolarEdge also induces and/or contributes to infringement by others.

228. Claim 10 of the ’403 Patent recites:

> **10.** A control unit for a photovoltaic panel having at least one photovoltaic cell, the control unit comprising:
>
> a voltage regulator configured to receive electric power generated by the at least one photovoltaic cell of the photovoltaic panel; and
>
> a controller coupled to the voltage regulator;
>
> wherein the voltage regulator is configured to generate a power output of the photovoltaic panel using the electric power received from the at least one photovoltaic cell;
>
> wherein the controller is configured to control operations of the voltage regulator based at least in part on communications with a remote unit disposed at a location remote from the photovoltaic panel, the communications including heartbeat signals from the remote unit; and
>
> wherein, after the controller detects an anomaly in the heartbeat signals from the remote unit, the controller causes the voltage regulator to reduce or shut down the power output of the photovoltaic panel.

229. SolarEdge has directly infringed and continues to directly infringe at least claim 10 of the ’403 Patent in violation of 35 U.S.C. § 271(a). SolarEdge directly infringes by making,

using, testing, demonstrating, selling, offering to sell, and/or importing the Accused Products, including the Accused Power Optimizers and Accused Inverters.

230. SolarEdge's infringement of the '403 Patent is shown by way of exemplary systems, as set forth in paragraphs 77-98 above, which demonstrate infringement of at least claim 10 of the '403 Patent by showing that:

a. the Accused Power Optimizers are control units that are connected to or embedded into PV panels, each of which has at least one PV cell, as stated by SolarEdge;

b. the Accused Power Optimizers have a buck/boost converter that is a voltage regulator and can shut down power export;

c. the Accused Power Optimizers have a microcontroller coupled to the buck/boost converter;

d. the buck/boost converter of each Accused Power Optimizer provides a power output of the PV panel to which the Accused Power Optimizer is connected. SolarEdge technical documents state that "[t]he power optimizers regulate the string voltage at a constant level";

e. the microcontroller of each Accused Power Optimizer communicates via powerline communication with an Accused Inverter, which SolarEdge technical documents show can be located remotely, and controls operations of the Accused Power Optimizer's buck/boost converter based in part on those communications;

f. the powerline communications between the Accused Power Optimizers and the Accused Inverter include communications from the Accused Inverter; and

g. after the controller detects changes in the communications from the Accused Inverter, the controller causes the buck/boost converter to shut down the power output of the PV panel via SolarEdge's SafeDC system.

231. Installers, customers, and end users also directly infringe one or more claims of the ’403 Patent. Installers directly infringe the asserted claims by assembling, installing, connecting, configuring, provisioning, commissioning, testing, and/or putting into service complete SolarEdge systems that include the Accused Products and PV modules. Installers, customers, and end users directly infringe by commissioning, activating, testing, putting the complete systems into service, and/or controlling their operation, and obtaining the benefit of the electrical power and related functionality produced by the systems.

232. The foregoing acts of installers and other third parties are attributable to SolarEdge for purposes of direct infringement. SolarEdge directs and controls the manner in which complete SolarEdge systems are installed, connected, configured, provisioned, commissioned, activated, monitored, and operated through the design of the Accused Products, SolarEdge installation manuals and quick-install guides, technical requirements, SetApp, SolarEdge Go, Mapper, Designer, and the SolarEdge monitoring platform, installer training and certification resources, and technical support. SolarEdge benefits from those acts because the resulting installation and commissioning of complete SolarEdge systems enables the intended sale, activation, operation, monitoring, and support of the Accused Products and expands the installed base of SolarEdge products and services. Accordingly, to the extent necessary, SolarEdge is responsible for those acts under principles of direction and control, agency, and/or vicarious liability, including with respect to the making and use of complete systems and the use and performance of the claimed inventions.

233. SolarEdge has had notice of and has been aware of the ’403 Patent since at least January 2, 2026, when Tigo sent a letter to SolarEdge Technologies notifying it of Tigo’s portfolio of patents. Ex. 9.

234. By continuing to make, use, sell, offer to sell, and/or import the Accused Products after SolarEdge first had notice of the ’403 Patent, SolarEdge indirectly infringes and continues to indirectly infringe by active inducement one or more claims of the ’403 Patent, including but not limited to exemplary claim 10, pursuant to 35 U.S.C. § 271(b). SolarEdge has done so by acts including but not limited to (1) selling, offering for sale, or importing the Accused Products which, when used as marketed and intended by SolarEdge, infringe the ’403 Patent either literally or under the doctrine of equivalents; (2) marketing the infringing capabilities of the Accused Products; and (3) providing instructions, technical support, and other support and encouragement for the infringing use of the Accused Products. SolarEdge has performed and continues to perform these affirmative acts with knowledge of the ’403 Patent and with the intent, or willful blindness, that the induced acts directly infringe the ’403 Patent.

235. By continuing to make, use, sell, offer to sell, and/or import the Accused Products after SolarEdge first had notice of the ’403 Patent, SolarEdge indirectly infringes and continues to indirectly infringe by contributing to the infringement of one or more claims of the ’403 Patent, including but not limited to exemplary claim 10, pursuant to 35 U.S.C. § 271(c). SolarEdge’s affirmative acts of manufacturing, selling, offering for sale, and/or importing the Accused Products, in this District and elsewhere in the United States, contribute to SolarEdge’s customers and end-users directly infringing the ’403 Patent with the Accused Products. The Accused Products are not a staple article or commodity of commerce, have no substantial non-infringing uses, and are known by SolarEdge to be especially made and/or especially adapted for use in infringement of the ’403 Patent. SolarEdge has performed and continues to perform these affirmative acts with knowledge of the ’403 Patent and with the intent, or willful blindness, that they cause the direct infringement of the ’403 Patent.

236. Tigo has suffered and continues to suffer damages as a result of SolarEdge's infringement of the '403 Patent in an amount to be determined at trial.

237. Tigo has suffered and will continue to suffer irreparable harm unless SolarEdge's infringement is enjoined by this Court. Tigo is entitled to all remedies available under the patent laws, including damages adequate to compensate for SolarEdge's infringement, enhanced damages for willful infringement, pre- and post-judgment interest, costs, and, where appropriate, injunctive relief under 35 U.S.C. § 283.

**COUNT EIGHT**

**Infringement of the '278 Patent**

238. Tigo restates and realleges each of the assertions set forth in the preceding paragraphs.

239. Pursuant to 35 U.S.C. § 282, the claims of the '278 Patent are presumed valid.

240. In view of the foregoing facts and allegations, including paragraphs 77-98 above, SolarEdge has infringed and continues to infringe one or more of the claims of the '278 Patent, including but not limited to exemplary claim 1 pursuant to 35 U.S.C. § 271. SolarEdge directly infringes by, without authority, making, using, testing, demonstrating, selling, offering to sell, and/or importing the Accused Products. SolarEdge also induces and/or contributes to infringement by others.

241. Claim 1 of the '278 Patent recites:

> **1.** A watchdog unit, comprising:
>
> connectors to couple the watchdog unit between a solar module and a power bus, the power bus configured to connect a plurality of solar modules to an inverter;
>
> a local controller configured to monitor a communication sent on the power bus from a central controller remote from the solar module and determine whether the communication has been interrupted for a time period longer than a number of allowed skips; and

at least one switch configured to disconnect the solar module from the power bus in response to a determination by the local controller that the communication from the central controller has been interrupted for a time period longer than the number of allowed skips;

wherein the watchdog unit is configured to connect the solar module to the power bus when the communication is not interrupted.

242. SolarEdge has directly infringed and continues to directly infringe at least claim 1 of the ’278 Patent in violation of 35 U.S.C. § 271(a). SolarEdge directly infringes by making, using, testing, demonstrating, selling, offering to sell, and/or importing the Accused Products, including the Accused Power Optimizers.

243. SolarEdge’s infringement of the ’278 Patent is shown by way of exemplary systems, as set forth in paragraphs 77-98 above, which demonstrate infringement of at least claim 1 of the ’278 Patent by showing that:

a. the Accused Power Optimizers are watchdog units;

b. the Accused Power Optimizers have that allow them to be coupled between a solar module (PV panel) and a power bus.;

c. SolarEdge’s technical documents show that the power bus of the system is configured to connect a plurality of solar modules to an Accused Inverter;

d. the Accused Inverters are central controllers remote from the PV panel(s). SolarEdge technical documents show that an Accused Inverter can be located within a home while power optimizers and PV panels are located on the roof of the home;

e. the Accused Power Optimizers have a microcontroller that monitors communication from an Accused Inverter, including whether the communications have been interrupted over a period of time;

f. the Accused Power Optimizers contain a switch which includes MOSFETs within a buck/boost converter, that allows the Accused Power Optimizers

to disconnect solar modules from the power bus in the absence of a communication for a period of time. For instance, in response to a loss of communication, the SafeDC system allows the Accused Power Optimizers to disconnect PV panels from the power bus.; and

g. the Accused Power Optimizers are configured to connect a PV panel to the power bus when the communications are not interrupted. For example, Power Optimizers output power generated by PV panels to the power bus when a powerline communication is present.

244. Installers, customers, and end users also directly infringe one or more claims of the ’278 Patent. Installers directly infringe the asserted claims by assembling, installing, connecting, configuring, provisioning, commissioning, testing, and/or putting into service complete SolarEdge systems that include the Accused Products and PV modules. Installers, customers, and end users directly infringe by commissioning, activating, testing, putting the complete systems into service, and/or controlling their operation, and obtaining the benefit of the electrical power and related functionality produced by the systems.

245. The foregoing acts of installers and other third parties are attributable to SolarEdge for purposes of direct infringement. SolarEdge directs and controls the manner in which complete SolarEdge systems are installed, connected, configured, provisioned, commissioned, activated, monitored, and operated through the design of the Accused Products, SolarEdge installation manuals and quick-install guides, technical requirements, SetApp, SolarEdge Go, Mapper, Designer, and the SolarEdge monitoring platform, installer training and certification resources, and technical support. SolarEdge benefits from those acts because the resulting installation and commissioning of complete SolarEdge systems enables the intended sale, activation, operation, monitoring, and support of the Accused Products and expands the installed base of SolarEdge

products and services. Accordingly, to the extent necessary, SolarEdge is responsible for those acts under principles of direction and control, agency, and/or vicarious liability, including with respect to the making and use of complete systems and the use and performance of the claimed inventions.

246. SolarEdge has had notice of and has been aware of the '278 Patent since at least January 2, 2026, when Tigo sent a letter to SolarEdge Technologies notifying it of Tigo's portfolio of patents. Ex. 9.

247. By continuing to make, use, sell, offer to sell, and/or import the Accused Products after SolarEdge first had notice of the '278 Patent, SolarEdge indirectly infringes and continues to indirectly infringe by active inducement one or more claims of the '278 Patent, including but not limited to exemplary claim 1, pursuant to 35 U.S.C. § 271(b). SolarEdge has done so by acts including but not limited to (1) selling, offering for sale, or importing the Accused Products which, when used as marketed and intended by SolarEdge, infringe the '278 Patent either literally or under the doctrine of equivalents; (2) marketing the infringing capabilities of the Accused Products; and (3) providing instructions, technical support, and other support and encouragement for the infringing use of the Accused Products. SolarEdge has performed and continues to perform these affirmative acts with knowledge of the '278 Patent and with the intent, or willful blindness, that the induced acts directly infringe the '278 Patent.

248. By continuing to make, use, sell, offer to sell, and/or import the Accused Products after SolarEdge first had notice of the '278 Patent, SolarEdge indirectly infringes and continues to indirectly infringe by contributing to the infringement of one or more claims of the '278 Patent, including but not limited to exemplary claim 1, pursuant to 35 U.S.C. § 271(c). SolarEdge's affirmative acts of manufacturing, selling, offering for sale, and/or importing the Accused Products, in this District and elsewhere in the United States, contribute to SolarEdge's customers

and end-users directly infringing the '278 Patent with the Accused Products. The Accused Products are not a staple article or commodity of commerce, have no substantial non-infringing uses, and are known by SolarEdge to be especially made and/or especially adapted for use in infringement of the '278 Patent. SolarEdge has performed and continues to perform these affirmative acts with knowledge of the '278 Patent and with the intent, or willful blindness, that they cause the direct infringement of the '278 Patent.

249. Tigo has suffered and continues to suffer damages as a result of SolarEdge's infringement of the '278 Patent in an amount to be determined at trial.

250. Tigo has suffered and will continue to suffer irreparable harm unless SolarEdge's infringement is enjoined by this Court. Tigo is entitled to all remedies available under the patent laws, including damages adequate to compensate for SolarEdge's infringement, enhanced damages for willful infringement, pre- and post-judgment interest, costs, and, where appropriate, injunctive relief under 35 U.S.C. § 283.

**JURY TRIAL DEMANDED**

Tigo hereby demands a trial by jury on all claims and issues so triable.

**PRAYER FOR RELIEF**

WHEREFORE, Tigo respectfully requests that this Court grant the following relief to Tigo:

A. Enter judgment that SolarEdge has infringed, both directly and indirectly, one or more claims of each of the Tigo Patents and continues to infringe those claims through: (1) the manufacture, use, offering to sell, and/or sale in the United States, and/or the importation into the United States, of infringing SolarEdge products; (2) the practice of claimed methods of the Tigo Patents by manufacturing, using, and/or testing SolarEdge products in the United States; and (3) the inducement of third parties to engage in such

infringing activity with knowledge of the Tigo Patents and of the third parties' infringing actions;

B. Enter judgment increasing the damages up to three times the amount found or assessed based on SolarEdge's willful infringement;

C. Enter judgment awarding Tigo monetary relief pursuant to 35 U.S.C. § 284 in an amount adequate to compensate for SolarEdge's infringement of the Tigo Patents to be determined at trial, but not less than a reasonable royalty, awarding Tigo all pre- and post-judgment interest and costs, and awarding Tigo enhanced damages for SolarEdge's willful infringement of the Tigo Patents;

D. Enter a permanent injunction pursuant to 35 U.S.C. § 283 enjoining SolarEdge, its officers, agents, servants, employees, and attorneys, and any other persons who are in active concert or participation with any of them and who receive actual notice of the injunction, from further infringing the Tigo Patents;

E. If a permanent injunction is not granted, or to the extent any continuing infringement is not enjoined, enter an order that SolarEdge pay to Tigo ongoing royalties in an amount to be determined for any infringement occurring after the date judgment is entered;

F. Enter an order, pursuant to 35 U.S.C. § 285, declaring this an exceptional case and awarding to Tigo its reasonable attorneys' fees; and

G. Enter an order awarding to Tigo such other and further relief, whether at law or in equity, that this Court deems just, equitable, and proper.

Dated: August 19, 2026

Respectfully submitted,

*/s/ Case Collard*

Case Collard (admitted)
State Bar No. 40692
collard.case@dorsey.com
**DORSEY & WHITNEY LLP**
1400 Wewatta Street, Suite 400
Denver, CO 80202
(303) 629-3400(main)
(303) 629-3450(facsimile)

*/s/ Mark D. Siegmund*
Mark D. Siegmund
Texas Bar No. 24117055
**CHERRY JOHNSON SIEGMUND JAMES PC**
Bridgeview Center
7901 Fish Pond Road, 2nd Floor
Waco, Texas 76710
Telephone: (254) 732-2242
Facsimile: (866) 627-3509
msiegmund@cjsjlaw.com

**ATTORNEYS FOR PLAINTIFF TIGO ENERGY INNOVATIONS LLC**